## BAXTER *v.* STATE

[No. 55, September Term, 1960.]

496

*Decided November 18, 1960.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Lawrence B. Coshnear,* with whom was *Harold Buchman* on the brief, for appellant.

*Joseph S. Kaufman, Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, Saul A. Harris* and *Charles E. Moylan, Jr., State's Attorney* and *Assistant State's Attorney of Baltimore City,* respectively, on the brief, for appellee.

HORNEY, J., delivered the opinion of the Court.

Harvey Paul Baxter (the defendant) was tried by a jury on a four-count indictment charging him with violations of the narcotics law. The first and second counts charged him with possession and control of marijuana on September 14, 1959, and the third and fourth counts related the fact that the

defendant was a second offender in that he had been previously convicted of possession and control of a narcotic on May 7, 1959. The jury returned a verdict of guilty. From the judgment entered thereon and the sentence imposed, this appeal was taken.

Besides the defendant, who was an itinerant musician, the other characters in this tragedy involving the use of narcotics are: Jean Askew, an unemployed model; Stanley Polakoff, the alleged informer, who, at the time, was free on bail under fourteen indictments for violations of the narcotics law; and George Pompiano, a "hi-fi" devotee, who had the apartment in Washington, D. C., which was the meeting place of the foursome. The four were well acquainted, and all had been or were narcotics users. The defendant had been discharged from the army as the result of a court-martial for possession of marijuana, and, at the time the instant offense was committed, was on probation as the result of the May 7th conviction. He claimed that he had not used narcotics since June of 1958.

What transpired on September 13 and 14, 1959, according to the defendant, was substantially as follows: he had found the other three in the Pompiano apartment listening to a hi-fidelity phonograph. During the visit Polakoff informed the defendant that he had obtained some recordings at a discount, and offered to sell him a part of them. The defendant readily agreed and a meeting was arranged at 9 p.m. the following evening at a drive-in restaurant in Baltimore. The drive-in was to be only a meeting place since the defendant and Polakoff were to go elsewhere to look at the records. But coincidentally with the discussion with respect to the record, Polakoff requested the defendant to secure some marijuana for Askew. At first the defendant refused (and he claimed that he had refused the same request many times before). But when Polakoff displayed the arm of the model (presumably punctured with hypodermic needle marks) the defendant relented and agreed to try to procure some marijuana (a habit-forming but not addictive narcotic) to alleviate her suffering. It seems she was having withdrawal or "kick-off" symptoms as the result of the cessation of the use of opium derivatives

known as dilaudide and heroin. The defendant claims he did not know, at the time, where he was going to get the marijuana.

The model testified as to a conversation she had with Polakoff in front of the apartment after the meeting had broken up. According to her, Polakoff stated that he hated the defendant and was going to "set him up." At any rate, at 5 p.m. the next day (September 14), Polakoff went to the Baltimore Central Police Station and informed the police that there would be a delivery of marijuana to him at the drive-in at nine o'clock that evening. While there is a conflict in the evidence as to who interrogated the informer, the record is clear that the police knew of the planned delivery before 6 p.m.

To return to the story of the defendant, he says he received a call at 6 p.m. from Pompiano asking him to drop by on his way home. He claimed he did not know why he was to stop, but when he arrived in front of the apartment at about 6:30, Pompiano placed a brown paper bag on the front seat of his automobile and told him to collect $50 and some dilaudide in exchange for the contents of the bag. Thus prepared, the defendant proceeded to the restaurant in Baltimore where he was arrested in the parking lot by Lieutenant Jacob Simonsen. The bag contained enough green marijuana for one hundred and forty cigarettes, and a partially smoked marijuana cigarette and a hypodermic needle were also discovered by the police in the automobile.

In his brief, the appellant makes two contentions: (i) that the trial court erred when it refused to direct a verdict of not guilty on the ground that entrapment had been established as a matter of law, and (ii) that the denial by the trial court of an opportunity to explore the whole relationship between Polakoff and the police was reversible error. Although there was no reference to the point in his brief, the defendant also argued in this Court (iii) that the introduction into evidence of the hypodermic needle was improper and prejudicial.

There was no evidence that Polakoff had previously been employed as an informer by the police department. Nor was it shown that he was ever paid anything for the information he supplied or that he was acting under a promise of leniency

or immunity from further prosecution under the untried indictments against him.

(i)

The law in this State with respect to the defense of entrapment was restated in *Ferraro v. State,* 200 Md. 274, 89 A. 2d 628 (1952), at p. *279* (by quoting from *Callahan v. State,* 163 Md. 298, 301, 162 Atl. 856 [1932]) in this manner:

> " 'It is not objectionable for an officer of the law to lay a trap or unite with others to detect an offender. The only effect would be to justify a more careful scrutiny of the evidence. Where the crime is not against the person nor the property of the instigator, it is not clear how, in the absence of special circumstances, the commission of crime at the solicitation or procurement of another, although an officer of the law, makes the culprit any less guilty than if the criminal design had originated with the wrongdoer himself.' "

In the *Ferraro* case, the informer (John W. Heineman), after his arrest for accepting wagers on football games, decided—apparently without inducement—to help the police in apprehending the persons "behind him" who were also engaged in violating the gaming laws. With marked money supplied by the police, the informer, having called and arranged meetings with the defendants (Ferraro and Patti) for the supposed purpose of delivering the day's wagers, met the defendants separately at the time and place arranged, while at the same time a police officer watched the transaction, and then immediately confronted the defendants and retrieved the marked money. In affirming the conviction of the defendants, we said at p. 281:

> "We do not find it necessary to decide which, if any, of the divergent views [1] of the defense of en-

---

1. The divergent views referred to in Ferraro were, of course, those held by the Justices of the Supreme Court of the United States in *Sorrells v. United States,* 287 U. S. 435 (1932). The same views were restated in the recent cases of *Sherman v. United States,*

trapment is law in Maryland. We think there is no evidence legally sufficient to support the defense of entrapment—on any accepted theory—certainly not to support a peremptory verdict of acquittal. If appellants' testimony were believed, there would be no guilt on their part and no entrapment. If their testimony is not believed, the activity of the police and their tool Heineman was 'permitted activity, frequently essential to the enforcement of the law' and had 'the appropriate object' of 'revealing the criminal design.' [2] This activity was no more unlawful or improper than the use of decoy letters to trap mail thieves or users of the mail for obscene matter. In the two expeditions * * * [in question] there was no pressure or inducement to lure an innocent man into crime, but only a shrewd and proper test to determine whether Heineman's information was true or * * * [Ferraro and Patti] were innocent."

In the case at bar, the trial court overruled the motion for a directed verdict and submitted the question of entrapment

---

356 U. S. 369 (1958) and *Masciale v. United States,* 356 U. S. 386 (1958). The majority in *Sorrells, Sherman* and *Masciale* proceeded on the theory—as it was expressed in a recent unsigned law note in 73 *Harvard Law Review* (1960) p. 1333 (at p. 1335)—that "[t]he criterion of entrapment which has won general acceptance is the 'origin of interest' test, which allows the defense only if the criminal act was 'the product of the creative activity' of law enforcement officials. Courts applying this test make two inquiries: Whether there was inducement on the part of the government official and, if so, whether the defendant showed any predisposition to commit the offense." The other test, that applied by the concurring opinions in *Sorrells* and *Sherman* and the dissent in *Masciale,* based the defense on an objective test—also stated at p. 1335 of 73 Harv. L. Rev.—"whereby the court considers only the nature of the police activity involved, without reference to the predisposition of the particular defendant. Thus police conduct which 'falls below standards to which common feelings respond for the proper use of governmental power' would bar a conviction."

2. These internal quotes are from the Sorrells case, *supra.*

to the jury. In so doing, the court, in addition to giving an instruction on the positive defense, which went farther in the defendant's favor than any prior decision of this Court, further instructed the jury to the effect that if the jury should find that the defendant, instead of being innocent of violating or participating in the violation of the narcotics law, had an intent to commit or join in the commission of the illegal transaction without any inducement, or that in fact no persuasion or appeal to his sympathy had been resorted to, then there was no entrapment and the defense would fail. The defendant did not object to the charge. Had he objected on the ground that the court had not correctly informed the jury of the proper test to be applied, then we might be confronted with a different question than the one raised by this appeal. But, here, as in *Ferraro*, where there were no special circumstances to support a peremptory verdict of acquittal, it was not error to overrule the motion for a directed verdict. There was evidence that the informer had numerous indictments against him for violations of the narcotics law, but there was no evidence that in informing the police he was acting under a promise of immunity or leniency, or that he was otherwise paid for the information he apparently had volunteered to the police. Instead, the only testimony which tended to show entrapment was that produced by the defendant to the effect that his intent was innocent and that he had been induced to violate the law. Even if we assume that a jury question was raised, the defendant cannot complain since the issue was in fact submitted to the jury.

(ii)

As we read the record, the second contention that it was reversible error to deny the defendant an opportunity to explore the whole relationship between the alleged informer and the police is without substance. At the end of the cross-examination of the arresting officer (Lieutenant Simonsen), he was asked whether Polakoff had given him or Captain Carroll any "previous tips on other suspects violating the narcotics law?" When the State interposed an objection to the question on the ground of irrelevancy, counsel for the defendant explained that it was "only to show * * * that he [meaning

Polakoff] was an informant and had been an informant for sometime." The court, however, sustained the objection because it did not "see the relevancy in this case," and counsel forthwith turned the witness back to the State. Up to the time this question was asked, Lieutenant Simonsen (who had not seen or discussed the case with Polakoff prior to arriving at the drive-in restaurant) had given no testimony, either on direct or cross-examination, on the subject inquired about. The refusal to permit the witness to answer was not an improper exercise of the discretion of the court. *Harris v. State,* 203 Md. 165, 99 A. 2d 725 (1953) ; *Corens v. State,* 185 Md. 561, 45 A. 2d 340 (1946). Moreover, the defendant himself does not even suggest that Polakoff was a paid informer or agent of the police. Instead, according to his theory of the defense he made, the mere use by the police of the tip-off, which had been inspired by enmity on the part of the informer, was an improper use of governmental power. In this setting, even if the informer had supplied the police with information on previous occasions it is not clear how the admission into evidence of such fact could have materially bettered the defense of entrapment in this case. We find no error in the ruling of the court.

### (iii)

During the oral argument in this Court, the defendant raised another question concerning the admission of the hypodermic needle as evidence, claiming it was irrelevant and prejudicial. While the defendant offered strong objection to the admissibility of the instrument below, he did not include the question in his brief. The presumption therefore is that he did not intend to press the point in this Court. In any event the question is not properly before us on the appeal. Maryland Rule 831 c 2, 4; *Mullan v. Mullan,* 222 Md. 503 (Footnote 1), 161 A. 2d 693 (1960) ; *Gray v. State,* 219 Md. 557, 150 A. 2d 221 (1959) ; *Comptroller of Treasury v. Aerial Products,* 210 Md. 627, 124 A. 2d 805 (1956).

For the reasons stated, the judgment must be affirmed.

*Judgment affirmed.*