## GROHMAN *v.* STATE OF MARYLAND

[No. 401, September Term, 1969.]

*Decided June 26, 1970.*

The cause was argued before HAMMOND, C. J., and MC-WILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Ronald A. Willoner*, with whom was *Robert B. Ostrom* on the brief, for appellant.

*Gilbert Rosenthal, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County*, and *James E. Kenkel, Assistant State's Attorney for Prince George's County*, on the brief, for appellee.

FINAN, J., delivered the opinion of the Court.

The State's Attorney for Prince George's County filed a petition to adjudicate the appellant in contempt of court for divulging and selling testimony of the grand jury for Prince George's County to a member of the public. An evidentiary hearing was held in the circuit court for that county on October 13, 1969, Digges, C.J., presiding. The appellant neither took the stand nor offered any evidence in his own behalf, but relied upon as his defense the doctrine of Purgation by Oath. In his affidavit of purgation he stated facts purporting to explain, excuse, and justify his actions, including a delineation of events which he contends compel the conclusion that he was entrapped by police authorities. In a written memorandum and order of court, dated November 20, 1969, issued without the presence of the accused, the trial court found the appellant to be in contempt. On December 18, 1969, the appellant was brought into court at which time he was sentenced by the court to serve a period of three months in the county jail. The accused has appealed the judgment to this Court.

The appellant contends the trial court was in error: (1) in holding that he had not been entrapped and (2) in rendering its judgment of contempt out of the presence of the accused by way of a written order delivered to the appellant's counsel through the United States mail.

In the present case we are first confronted with an *in limine* question as to whether or not entrapment, a defense to a criminal charge, is available as a defense in

a criminal contempt proceeding. As Judge Hammond, now Chief Judge, observed in *Sheets v. City of Hagerstown,* 204 Md. 113, 120, 102 A. 2d 734 (1954) : "* * * The line between civil and criminal contempt is often indistinct." And, as was noted by this Court in *In re Lee,* 170 Md. 43, 47, 183 A. 560 (1936) : "* * * In spite of verbiage used to designate them [contempt proceedings], they are 'neither wholly civil nor criminal.' *Gompers v. Buck's Stove Range Co.,* 221 U.S. 418, 31 S. Ct. 492, 55 L. Ed. 797."

However, in view of what our predecessors said in *Kelly v. Montebello Park Co.,* 141 Md. 194, 118 A. 600 (1922), we view the present proceeding in the nature of a criminal contempt proceeding, as did the court below. In *Montebello, supra,* this Court quoted with approval the following language from *Bessette v. W. B. Conkey Co.,* 194 U. S. 324, 24 S. Ct. 665, 48 L. Ed. 997 (1904) :

> " 'Proceedings for contempts are of two classes, those prosecuted to preserve the power and vindicate the dignity of the Courts and to punish for disobedience of their orders, and those instituted to preserve and enforce the rights of private parties to suits, and to compel obedience to orders and decrees made to enforce the rights and administer the remedies to which the Court has found them to be entitled. The former are criminal and *punitive* in their nature, and the government, the Courts and the people are interested in their prosecution. The latter are civil, remedial and coercive in their nature and the parties chiefly in interest in their conduct and prosecution are the individuals whose private rights and remedies they were instituted to protect and enforce.' " (emphasis supplied.) 141 Md. at 197.

The divulging of judicial secrets has long been regarded both by statute, as well as at common law, as an interference with the functioning of the courts and the ad-

ministration of justice. *Baltimore Radio Show, Inc. v. State,* 193 Md. 300, 320, 67 A. 2d 497 (1949), and *In re Lee, supra.*

As has become apparent from this discussion, we are of the opinion that the gravamen of this contempt is criminal in substance and although this is not a criminal proceeding, we can see no logical or fair reason why the defense of entrapment should not be available to one so accused. It is likewise clear from the opinion of the lower court that the trial judge assumed that such a defense could be relied upon by the accused. This then leads us to the consideration as to whether the evidence in the record supports the entrapment of the accused.

In *Baxter v. State,* 223 Md. 495, 499, 165 A. 2d 469 (1960), we stated:

> "The law in this State with respect to the defense of entrapment was restated in *Ferraro v. State,* 200 Md. 274, 89 A. 2d 628 (1952), at p. 279 (by quoting from *Callahan v. State,* 163 Md. 298, 301, 162 Atl. 856 [1932]) in this manner:
>
> > 'It is not objectionable for an officer of the law to lay a trap or unite with others to detect an offender. The only effect would be to justify a more careful scrutiny of the evidence. Where the crime is not against the person nor the property of the instigator, it is not clear how, in the absence of special circumstances, the commission of a crime at the solicitation or procurement of another, although an officer of the law, makes the culprit any less guilty than if the criminal design had originated with the wrongdoer himself.' "

In *Baxter,* Judge Horney writing for the Court commented on the fact that this Court in *Ferraro v. State,* 200 Md. 274, 89 A. 2d 628 (1952) recognized that there were two divergent views held by respected authorities concerning the conditions under which entrapment should apply but that this Court had not expressed a preference

as to which of the views it favored. The divergent views referred to in both *Baxter* and *Ferraro* were the views espoused by the majority of the Justices of the Supreme Court of the United States in *Sorrells v. United States,* 287 U. S. 435 (1932), *Sherman v. United States,* 356 U. S. 369 (1958), and *Masciale v. United States,* 356 U. S. 386 (1958), as contrasted with the view expressed in concurring opinions in *Sorrells* and *Sherman* and the dissent in *Masciale.* The *Baxter* case contains a lengthy footnote discussing these views which we would paraphrase by the statement that the majority opinion of the three Supreme Court cases adopted the "origin of interest" test, which allows the defense of entrapment only if the criminal act was "the product of the creative activity" of law enforcement officials. In applying this test the court must make two inquiries: (1) whether there was an inducement on the part of the government officials and if so (2) whether the defendant showed any predisposition to commit the offense. The other criterion adopted by the concurring opinions in the *Sorrells* and *Sherman* cases and the dissent in *Masciale* based the defense of entrapment upon an objective test whereby the court considers only the nature of the police activity involved without reference to the predisposition of the particular defendant: "Thus police conduct which falls below standards to which common feeling responds for the proper use of governmental power would bar conviction." Note, *Entrapment.* 73 Harv. L. Rev. 1333, 1335 (1960).

However, it was not until *Simmons v. State,* 8 Md. App. 355, 259 A. 2d 814 (1969) that a clear cut expression of the view adopted by Maryland was made. In *Simmons,* Judge Orth writing for the court entered into a comprehensive discussion of the salient Maryland cases on entrapment and brought further clarity to the matter with this statement:

> "* * * It appears that the Court of Appeals has expressly not adopted either of the two divergent views regarding entrapment. In *Ferraro* it

discussed at length the divergent views in the majority and concurring opinions in *Sorrells* but concluded: 'We do not find it necessary to decide which, if any, of the divergent views of the defense of entrapment is law in Maryland.' 200 Md. at 281, 89 A. 2d at 631. And see *Baxter v. State, supra,* at 499-500, 165 A. 2d 469, quoting *Ferraro*. We feel it advisable now to adopt a test for the application of the rule regarding the defense of entrapment. We believe that the view of the majority in *Sorrells,* restated in the majority opinions of *Sherman v. United States, supra* and *Masciale v. United States,* 356 U. S. 386 is the better one, and adopt it. We note that in *Sherman,* the Court said, 356 U.S. at 372, 78 S. Ct. at 820: 'The intervening years have in no way detracted from the principles underlying [the Sorrells] decision.' We think, at the least, the opinions of the Court of Appeals do not preclude its adoption.

"We construe the opinion of the Court in *Sorrells* as enunciating what has been termed the 'origin of interest' test. This test was stated in substance by Judge Learned Hand in *United States v. Sherman,* 200 F. 2d 880 (2d Cir. 1952). Probing the aspect of inducement he concluded that in *Sorrells* 'all the Court agreed as to the meaning of inducement: it was that someone employed for the purpose of the prosecution had induced the accused to commit the offense charged which he would not have otherwise committed.

\* \* \*

'Therefore in such cases two questions of fact arise: (1) did the agent induce the accused to commit the offense charged in the indictment; (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to com-

mit the offence. On the first question the accused has the burden; on the second the prosecution has it.'

The principles by which these questions of fact are to be determined by the courts were outlined in *Sorrells.* See 287 U.S. at 451, 53 S. Ct. 210. As stated in *Sherman,* 356 U.S. at 373, 78 S. Ct. at 821, they are:

'On the one hand, at trial the accused may examine the conduct of the government agent; and on the other hand, the accused will be subjected to an 'appropriate and searching inquiry into his own conduct and predisposition' as bearing on his claim of innocence.'

Once the accused has met his burden by establishing that the police induced him to commit the offense charged, it does not necessarily follow that the State, to meet its burden of showing that the accused had a predisposition to commit the offense, must show that the police prior to the inducement, had a 'reasonable suspicion' that the accused was engaged in the commission of a crime or was about to be. It is clear that if the original suggestions or initiative had come from the accused this would not be necessary. See Cornelius, *The Law of Search and Seizure* (2d Ed.) § 75, p. 256. But contrary to Cornelius, who was discussing the point in the fame of reference of the test we have here adopted, even if the initiative had not come from the accused, we think that on the totality of the circumstance it may be shown that the accused was 'ready and willing without persuasion' and was 'awaiting any propitious opportunity to commit the offense.' As to this, reasonable suspicion that the accused was engaged or about to engage in the commission of an offense would be relevant and material but not essential. We find support for

our view in *Smith v. State*, 242 Md. 712, 219 A. 2d 16 * * *."

The court in *Simmons* also characterized "reasonable suspicion" as being "more than mere suspicion but less than probable cause." 8 Md. App. at 367. Applying the principles of the law of entrapment as enunciated in *Simmons*, to the case at bar, we agree with the conclusion reached by Judge Digges in the lower court that the evidence does not support the defense of entrapment. We think a recitation of the rather bizarre set of facts which gave rise to this action bears this out.

On February 25, 1969, the State's Attorney for Prince George's County received information from a member of the Prince George's County Bar that a member of the grand jury, whose name began with a "G" and who had a warrant outstanding against him for nonsupport, appeared interested in obtaining money for information on matters transpiring before that body. An Assistant State's Attorney was briefed on the matter and he in turn consulted with the foreman of the grand jury. It should be added at this point that a check of the list of grand jurors showed that the appellant Grohman fell into the category of one whose name began with "G" and against whom there was an outstanding warrant for nonsupport. The foreman of the grand jury and the Assistant State's Attorney consulted with Judge Powers, who had delivered the original charge to the grand jury. Judge Powers suggested that the matter be investigated and at this juncture the Maryland State Police were called upon for assistance.

Sergeant Mazzone of the Maryland State Police was assigned to the investigation and on March 6, 1969, telephoned the appellant's home. Since the appellant was not at home, he spoke to the appellant's wife. He introduced himself as Tony Rinaldo and indicated that he wished to speak to the appellant in order to obtain certain information concerning the grand jury proceedings. The appellant was not at home when Sergeant Mazzone called back about an hour later and at this time he indicated to

the wife that he was a gambler. Sergeant Mazzone finally contacted the appellant the following morning at which time he indicated that if the appellant would get him certain information about matters before the grand jury, it would be worth something to the appellant. The evidence is unclear as to who suggested the first meeting between them but we will assume that it was Sergeant Mazzone. In any event, the appellant suggested the time and place and gave directions as to how to get there to the Sergeant.

Because he had appeared already before the grand jury and was fearful that the appellant would recognize him, Sergeant Mazzone brought Trooper Warren Pitt of the Maryland State Police into the investigation. It is significant to note that Sergeant Mazzone and Trooper Pitt both testified at the evidentiary hearing. Pitt was to act as a "go-between" between Mazzone ("Tony") and the appellant. Pitt assumed the name "Vince." Pitt was given $50 and told to meet the appellant. Pitt met the appellant, to whom he was represented as "Vince," and said that "Tony" had sent him. The appellant said he was not exactly certain what information "Tony" wanted and requested "Vince" to have "Tony" call the appellant the following day. Trooper Pitt, before he left this rendezvous which was in a snackbar, placed $50 under a napkin on the table and left. The appellant picked up the $50 and subsequently spent it. Sergeant Mazzone telephoned the appellant the following day and asked him whether "Vince" had given him the entire $50. The appellant replied in the affirmative and asked Mazzone just what information he wanted him to get. Mazzone explained to him that he wanted all of the names that a witness named Bobby Jones, who was scheduled to testify on March 17, would mention to the grand jury and Mazzone, still masquerading as "Tony," told the appellant that he was in illegal activities. Further arrangements were made during this conversation for the appellant to meet either "Vince" or "Tony," at the noon-break of the grand jury on March 17.

On March 17, 1969, Sergeant Mazzone gave Trooper Pitt $50 in pre-recorded bills and Pitt took this money to the parking lot adjacent to the court house at approximately 11:45 A.M. Trooper Pitt met the appellant and asked for the information. This contact was observed by an Assistant State's Attorney and Sergeant Mazzone. The appellant stated that he had left his notes in the grand jury room and that he would get them and return and meet "Vince" at 1:00 P.M. The meeting took place at 1:00 P.M. and several slips of paper containing notes were handed to Trooper Pitt by the appellant and in return Trooper Pitt ("Vince") handed the appellant $50. This second meeting was also observed by an Assistant State's Attorney and Sergeant Mazzone. The appellant almost immediately thereafter was arrested while he was seated in his car counting the money.

The appellant in his oath of purgation, the nature of which we will discuss later, stated that while he was a member of the grand jury he had lost his job as a printer and found it necessary to go to Bob's Gun and Pawn Shop to pawn certain articles and that he was known by the owner as a member of the grand jury. It later developed that it was through the proprietor of the pawn shop that suspicions concerning the appellant originated. The appellant also states in his oath of purgation that immediately after his first telephone conversation with "Tony" on March 7, he contacted Sergeant Joseph Thornberry of the Prince George's County Police Department, who had been a lifelong acquaintance. He told him of the situation and that he was to meet "Tony" the next day in a Mount Rainier snackbar. He asked Thornberry's advice and also that he follow him to the rendezvous. Thornberry refused to accompany him and advised him not to accept any money under any circumstances and further to contact the State's Attorney's Office. The appellant alleges that he was afraid of, and did not trust, the State's Attorney or an Assistant State's Attorney to whom Thornberry referred him. On March 11, the appellant states that he again contacted Sergeant Thornberry and told

him that he had met "Vince" and was informed that "Tony" was interested in information which Bobby Jones was to give to the grand jury on March 17. He stated that he had been offered $100 for this information and that he had asked for more money so that he could arrange a meeting with "Tony" at a motel in Marlboro. He gave Sergeant Thornberry the tag number of a Cadillac which he thought belonged to either "Vince or Tony" but which turned out to have nothing to do with this case. The appellant called his minister during this week and informed him of what occurred up to that point and asked for advice. The Reverend suggested that he pray. He stated that he discussed the matter during the week with members of his family and friends and they all agreed that he needed help but none suggested that he was doing anything wrong. He also discussed this with his barber. The appellant concluded his oath of purgation by stating that he thought the information which he had given "Vince" was of little significance and that he had no intention of doing anything which would place him in contempt of court. The appellant also in his affidavit claimed that "Tony," in his initial conversation with the appellant's wife, told her that if she wanted her husband "knocked off" he would take care of it.

The appellant did not take the stand or offer any evidence in his own behalf at the evidentiary hearing in the lower court but relied entirely upon his "Affidavit In Opposition To Petition To Adjudication In Contempt." This type of defense is known as purgation by oath and is available to an accused in a contempt proceeding. Under this procedure the State cannot contravene the facts set forth in the defendant's affidavit. The single remedy for the State if it considers the affiant has failed to set forth the facts in the affidavit truthfully is to bring an action against him for perjury. This procedure is no longer viable in most states but is apparently assumed to be available to a defendant in this State on the authority of *Murdock's Case*, 2 Bland 461 (1830) and *Ex Parte Bowles*, 164 Md. 318, 165 A. 169 (1933), although in this latter

case we fail to find that any issue was made of its use.[1] In *Murdock,* however the Court said:

"* * * If the party attached makes a full and frank answer to all the facts, and positively denies or justifies all that is alleged against him, he must be at once discharged, as having entirely acquitted himself of the contempt imputed to him. I know of no instance in this Court in which proofs and affidavits have been allowed to be introduced in opposition to the answer of the accused. If, on the other hand, the accused does not, by his answer, fully deny or justify the acts charged against him, he may be fined and imprisoned, or such terms imposed upon him as the justice of the case may require. *Childrens v. Saxby,* 1 Vern, 207; *Angerstein v. Hunt,* 6 Ves. 488." 2 Bland 487.

The practice of purgation by oath was struck down in the federal system in *United States v. Shipp,* 203 U. S. 563, 574-575 (1906) and Mr. Justice Holmes, writing for the Court, made it the subject of a ringing denunciation, stating:

"* * * On this occasion we shall not go into the history of the notion. It may be that it was an intrusion or perversion of the canon law, as is suggested by the propounding of interrogatories and the very phrase 'purgation by oath' (juramentum purgatorium). If so, it is a fragment of proof which does not prevail in theory or as a whole; and the reason why it has not disappeared perhaps may be found in the rarity with which contempts occur. It may be that even now, if the sole question were the intent of an ambiguous act, the proposition would apply. But in this case it is a question of personal presence

---

1. Curtis, "The Story of A Notion In The Law of Criminal Contempt," 41 Harv. L. Rev. 51.

and overt acts. If the presence and the acts should be proved there would be little room for the disavowal of intent. And when the acts alleged consist in taking part in a murder it cannot be admitted that a general denial and affidavit should dispose of the case. The outward facts are matters known to many and they will be ascertained by testimony in the usual way. The question was left open in *Re Savin,* 131 U.S. 267, 33 L. Ed. 150, 9 Sup. Ct. Rep. 699, with a visible leaning toward the conclusion to which we come, and that conclusion has been adopted by state courts in decisions entitled to respect. *Huntington v. McMahon,* 48 Conn. 174, 200, 201; *State v. Matthews,* 37 N. H. 450, 455; *Bates's Case,* 55 N. H. 325, 327; *Re Snyder,* 103 N. Y. 178, 181, 8 N. E. 479; *Crow v. State,* 24 Tex. 12, 14; *State ex rel. Mason v. Harper's Ferry Bridge Co.* 16 W. Va. 864, 873. See *Wartman v. Wartman, Taney,* 362, 370 Fed. Cas. No. 17,210; *Cartwright's Case,* 114 Mass. 230; *Eilenbecker v. District Court,* 134 U.S. 31, 33 L. Ed. 801, 10 Sup. Ct. Rep. 424. Whether or not Rev. Stat. § 725, U. S. Comp. Stat. 1901, p. 583, applies to this court, it embodies the law so far as it goes. We see no reason for emasculating the power given by that section, and making it so nearly futile as it would be if it were construed to mean that all contemners willing to run the slight risk of a conviction for perjury can escape."

We adopt the rejection, as did Holmes, of this archaic form of defense of purgation by oath in contempt proceedings, as being a legal anachronism. In all logic and fairness the State should be allowed by competent evidence to contravene matters set forth in the affidavit filed by the defendant in such cases. However, we fully realize that the rejection of this doctrine of purgation by oath by this Court will have only a prospective effect and will not

deny its use to the appellant in the present proceeding or affect the "rights of defendants which may have so accrued." *Deems v. Western Maryland Ry.,* 247 Md. 95, 115, 231 A. 2d 514 (1967).

For the purpose of this appeal this Court assumes, as did the lower court, that the appellant's version of the facts as set forth in his affidavit is true, with the exception of those matters which on their face appear as hearsay, such as the purported threat made by "Tony" (Sergeant Mazzone) to the appellant's wife over the telephone and later repeated by her to him. However, giving the appellant full benefit of his version of the facts as set forth in his affidavit, we do not think that considering the affidavit in conjunction with the record as a whole, a defense of entrapment was established.

First of all we are of the opinion that there was such a reasonable suspicion regarding the accused's conduct as to warrant the launching of the investigation by the State Police. We think that when the State Police employed its investigative technique, the accused already had a predisposition to divulge and sell the information. In this context they did not "create the crime," or as stated in *Sorrells* they were not the "origin of interest." We believe the State met the burden of proof in this area. Furthermore, although the State set the stage for the commission of the offense the record fails to reveal "repeated and persistent solicitation." *Stewart v. State,* 232 Md. 318, 321, 193 A. 2d 40 (1963). A total of eight days elapsed between the first rendezvous between "Vince" and the appellant and the final rendezvous when the second $50 changed hands. The appellant in the interim talked with a number of individuals concerning his misgivings but significantly avoided reporting it to the State's Attorney as he had been advised to do by Officer Thornberry. If we accept the appellant's statement that he mistrusted the State's Attorney we are still perplexed by his failure to report it to Judge Powers who had delivered the charge to the grand jury and who would have been available during this period at the court house where the

grand jury was convened. We have no doubt that had he sought advice from either of these sources he would not find himself in his present predicament. In addition the appellant flatly chose to ignore Sergeant Thornberry's advice not to accept any money under any circumstances.

The appellant's final issue concerns the rendering of the verdict by the lower court out of his presence. We are fully aware that in a criminal case Maryland Rule 775 requires the presence of the accused at every stage of the trial including the return of the verdict and the imposition of the sentence. The Rule is also a restatement of the common law right preserved for an accused by Article 5 of the Declaration of Rights of the Constitution of the State of Maryland. See also *Journigan v. State,* 223 Md. 405, 164 A. 2d 896 (1960) ; *Midgett v. State,* 216 Md. 26, 139 A. 2d 209 (1958) ; *Young v. State,* 5 Md. App. 383, 247 A. 2d 751 (1968). However, as we stated at the beginning of this opinion in our quotation from *In re Lee,* "* * * in spite of verbiage used to designate them [contempt proceedings] they are 'neither fully civil nor criminal.' * * *'" See also *Gompers v. Buck's Stove & R. Co.,* 221 U.S. 418, 441 (1911) and *Bessette v. W. B. Conkey Co.,* 194 U. S. 324, 326 (1904). In this latter case the United States Supreme Court stated that, "a contempt proceeding is *sui generis.* It is criminal in its nature, in that the party is charged with doing something forbidden, and if found guilty is punished. Yet it may be resorted to in civil as well as criminal actions and also independently of civil or criminal action." 194 U.S. at 326.

Therefore, we do not look at this unqualifiedly as a criminal case. No doubt it would have been preferable for the court to have had the accused present and to have read its "Memorandum and Order" in which the verdict was incorporated to him. However, we do not find that the rights of the appellant were in any way prejudiced by this omission. We think it significant that the appellant was present in court on December 18, 1969, when sentence was passed upon him. Prior to the imposition of the sentence, his counsel was not only given the opportunity

to speak but delivered a very effective commentary on the excellent reputation that the appellant enjoyed in the community and the emotional strain under which he was operating at the time of the contemptuous act. In addition the accused was asked by the court if there was anything that he wished to say prior to the sentencing. At this time the court also summarized the testimony and the reasons upon which the verdict was predicated. Under these circumstances we are of the opinion that if there was any error committed by the court in mailing the verdict to the accused it was harmless error. See *State v. Babb,* 258 Md. 547, 267 A. 2d 190 (1970).

*Judgment affirmed, the State to pay costs.*