790 A.2d 738

**Gary Wesley KENNEY**

v.

**STATE of Maryland.**

**No. 1032, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

April 11, 1985.

556

Arnold G. Foreman, Baltimore (Henderson, Green & Foreman, Baltimore, on the brief), for appellant.

Ann E. Singleton, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, Warren B. Duckett, Jr., State's Atty. for Anne Arundel County and Phillip Caroom, Asst. State's Atty. for Anne Arundel County, Annapolis, on the brief), for appellee.

Submitted before BISHOP, ALPERT, and ROSALYN B. BELL, JJ.

ROSALYN B. BELL, Judge.

The issue raised in this appeal by Gary Wesley Kenney is one of entrapment. Kenney was convicted by a jury in the Circuit Court for Anne Arundel County of unlawfully receiving money from a person confined in a penal institution within the State and attempted distribution of a controlled dangerous substance. He was sentenced on both counts.

Gregory Rivers was an inmate at the Maryland Correctional Institution located in Jessup, Maryland. He testified that in July, 1983, he was serving a sixteen year sentence in the Maryland House of Correction for forgery and armed robbery. In May or June, 1983, Rivers asked for protective custody in the segregated section of the prison. The Chief of Security, Bernard Smith, called Rivers into his office to find out the reason for his request. Rivers explained that he was involved in smuggling drugs to fellow inmates, and

that his physical safety had become endangered due to his inability to supply the drugs upon receipt of payment. Smith asked Rivers to set up another drug buy. Rivers agreed. Under this arrangement, Rivers using five $20 bills, would buy drugs from Kenney, a correctional officer. The buy would take place on July 20, 1983.

Rivers related that on July 20, 1983, he sent for Kenney through Correctional Officer Hampsey at approximately 12:30 a.m., but Hampsey told him that Kenney was not on that shift. At approximately 6:15 a.m. on July 21, 1983, Rivers was able to contact Kenney and asked him to obtain some marijuana and some "tall ones." Kenney agreed to do so, telling Rivers that he would take care of it when he returned to work after several days of leave. Rivers passed the money (provided by Smith) to Kenney, who put it in his pants pocket. Rivers gave Kenney a piece of paper with a fictitious name and address in Baltimore and told Kenney he could contact that person if he had trouble getting the marijuana. Kenney gave Rivers the address of Doris Harrison, P.O. Box 353, Jessup, Maryland 20794, and told him that Rivers could use that box if he wanted to send anything or have anything sent to him. Later that day, Rivers told Warden Lyles that he had given Kenney a slip of paper with the fictitious address.

Smith stated that he had responsibility for the security of the institution and that his duties included investigating and disciplining improprieties among correctional officers. When he learned Rivers had been moved from the general population to protective custody status, Smith became suspicious. He sent for Rivers because he learned that other inmates had chased Rivers with a shank (homemade knife).

When Rivers told Smith how he had gotten into trouble, Smith investigated the matter. Later, Rivers agreed to use the five $20 bills which Smith had obtained from the State Police to pay Kenney for obtaining drugs. This arrangement was to demonstrate to Smith that Kenney would take a bribe and was willing to bring contraband into the institu-

tion.  Smith explained that, because prisoners were allowed to have only twenty cents a month for phone calls, the possession of any other U.S. currency was considered contraband in the prison.  Regulations require correctional officers who find such forbidden goods to bring it to the attention of their immediate supervisor as soon as possible.

Smith gave Rivers the five $20 bills around July 20, 1983, and Major Richard Singletary told Smith the next day that the transaction had occurred.  Having obtained this information between 7:00 and 8:00 a.m., Smith then had a meeting with Kenney and others.  Kenney did not mention the contraband when given the opportunity to do so at the meeting.  Following this meeting, Kenney and Smith went to the warden's office where a plainclothes State Trooper was also present.  Warden Lyles read aloud the policy about receiving gifts from inmates and the applicable regulations.  When asked if he had anything to say, Kenney said, "No."  A subsequent search revealed four of the $20 bills in Kenney's left shirt pocket.  Smith later questioned Rivers, who said he had given Kenney all five bills.  The fifth bill was never found.

Warden Lyles recounted that in late June, 1983, he went to Smith's office where Rivers was being interviewed. Lyles corroborated the testimony of the others concerning events to which he was privy.  Rivers later told Lyles that they should look for a piece of paper with an address on it in Kenney's possession.

On July 20, 1983,[1] Sergeant Drum went to the Maryland House of Correction and met with Major Singletary, Warden Lyles, Security Chief Smith, another supervisor and Kenney.  Warden Lyles discussed the regulations and specifically addressed comments to Kenney before requesting him to empty his pockets.  Four of the $20 bills supplied by Smith were found in Kenney's pockets.

---

1.  The testimony of the witnesses varied as to the precise date, but that is not an issue in this appeal.

Drum stated that he advised Kenney of his *Miranda* [2] rights, and Kenney chose not to make any statement at that time. The officer took Kenney to the Glen Burnie Barracks where he was fingerprinted and photographed. While at the barracks, Drum received a call from Warden Lyles. As a result of that conversation, he asked Kenney to empty his pockets. Drum was looking for a small piece of paper that supposedly had an address of a person in Baltimore written on it. During the inspection of the items Kenney removed from his pockets, Drum noticed that Kenney had taken a piece of paper out of his left shirt pocket, which he opened, looked at quickly and then popped into his mouth and swallowed. The only thing Drum had seen was a Zip code—21230—written in black ink but not typed. The officer estimated that the piece of paper was approximately 2½ by 2½ inches. As Kenney swallowed the piece of paper, Drum said "Well, we really don't need that anyway." Later, Kenney said "the reason I did that ... is I don't want people fucking with me." During the drive back to the institution, Kenney volunteered that, "This guy wanted me to get something on the outside for him."

The parties stipulated that the United States Postmaster in Jessup, Maryland, would testify that P.O. Box 353 was registered to Kenney. Further, the parties stipulated that the phrase "tall ones" was a common street name for a controlled dangerous substance named pentazocine.

Kenney moved for judgment of acquittal at the end of the State's case, arguing that there was insufficient evidence and that entrapment had been shown as a matter of law. The trial court denied the motion, explaining:

"I don't think there's really any need for the State to argue. I think the State has established a *prima facie* case as to all three, and attempt is a common law crime. An attempt to commit a statutory violation is still a common law [offense] under the Maryland Law, so I

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

think two and three are valid. And there—there's no indication that there was any coercion to get the defendant to do something that he wasn't naturally going to do, so entrapment doesn't even apply. So I will deny your motion on all three grounds."

Warden Lyles also testified as a defense witness and produced records showing that Rivers had numerous convictions and that his request for parole had been refused.

Correctional Officer James Johnson related that he knew Rivers and years before had picked him up after his escape. Rivers had told him then that he would "get" Kenney, and Johnson had warned Kenney to watch out for Rivers.

Kenney took the stand and recounted that he knew Rivers and had testified against him in his trial for escape. Sgt. Johnson had informed Kenney of Rivers' threats. Although Kenney admitted that he had a post office box in Jessup, he claimed to use it for his shoe selling business and denied any dealings with inmate Rivers that would involve bringing drugs into the institution.

In describing the chain of events, Kenney admitted talking with Rivers on July 20, 1983, but claimed that Rivers said his father had died and he wanted to make a phone call. A short time later, Kenney returned saying he could not bother Major Singletary to obtain permission for such telephone usage. At that point, Rivers gave Kenney a piece of paper with a girl's name on it asking that it be added to his visitor's list. After this conversation, Kenney looked down and saw money on the floor, which he picked up. He did not count it, but put it in his left shirt pocket. Since he had not found it in any inmate's possession, Kenney wanted to see Lieutenant Colburn before turning it in. He then went to Singletary's office, Smith's office and finally Warden Lyles' office. When asked if anything unusual had happened on the shift, he said no, because he thought the Warden meant escape attempts.

Later, when Kenney admitted to Sergeant Drum that he ate the piece of paper with the girl's name and address on it, he explained that he did not want Drum "to have another

nail for my coffin." Kenney further testified that he never intended to bring drugs to Rivers and that Rivers had not handed him the money.

At the close of all the evidence, Kenney did not renew his motion for judgment of acquittal. He also failed to request any instruction on entrapment, nor did the trial court give one. The jury found Kenney guilty of Count I, receiving money from an inmate, and Count II, attempted distribution of a controlled dangerous substance.

### –Entrapment–

■ Entrapment has been defined as the "coaching or coaxing, enticing or otherwise inducing of another person by a police officer or an agent provocateur to commit a crime that he or she ordinarily would not commit, and the person does commit the crime in response to the inducement." Gilbert and Moylan, *Maryland Criminal Law: Practice and Procedure* 237. It has long been recognized as a defense for those who were euchred into an illegal act by the very people who were the prosecutors.

The rationale behind the defense was articulated in *Sorrells v. United States*, 287 U.S. 435, 452, 53 S.Ct. 210, 216, 77 L.Ed. 413 (1932), when the Court held that "The defense is available, not in the view that the accused though guilty may go free, but that the Government cannot be permitted to contend that he is guilty of a crime where the government officials are the instigators of his conduct."

■ Two different theories arose under the umbrella of entrapment. Chief Justice Hughes explained one of them in *Sorrells, supra,* in stating that the defense precludes as a means of law enforcement "the instigation by government officials of an act on the part of persons otherwise innocent in order to lure them to its commission and to punish them." *Id.* at 448, 53 S.Ct. at 215. The thrust of the defense is that the defendant had no predisposition to commit the crime. Thus, "if the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue." *Id.* at 451, 53 S.Ct. at 216.

In a concurring opinion, Mr. Justice Roberts expressed a slightly different view "that courts must be closed to the trial of a crime instigated by the government's own agents." *Id.* at 459, 53 S.Ct. at 219. The distinction between the majority and the concurring opinions lies in their emphasis. The first stresses the defendant's predisposition, whereas the second focuses on whether the government "instigated the crime."

In *Ferraro v. State,* 200 Md. 274, 281, 89 A.2d 628 (1952), the Court of Appeals acknowledged entrapment as a defense in Maryland, but did not adopt either of the two theories expressed in *Sorrells.* The purview of the defense was articulated and the divergent views set forth in *Sorrells* were explored in *Simmons v. State,* 8 Md.App. 355, 259 A.2d 814 (1969). In an opinion by Judge Orth, this Court adopted the majority view presented in *Sorrells, supra,*[3] and construed it as establishing an "origin of interest" test. *Simmons,* 8 Md.App. at 360, 259 A.2d. 814. Judge Learned Hand explicated this test in *United States v. Sherman,* 200 F.2d 880 (2d Cir.1952), *rev'd on other grounds,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), stating that in *Sorrells*

"all the Court agreed as to the meaning of inducement: it was that someone employed for the purpose by the prosecution had induced the accused to commit the offence charged, which he would not have otherwise committed."

*Id.* at 882. Judge Hand went on to point out that

"it is a valid reply to the defence, if the prosecution can satisfy the jury that the accused was ready and willing to commit the offence charged, whenever the opportunity offered.

\*    \*    \*    \*    \*    \*

---

**3.** This view was restated in *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), and *Masciale v. United States,* 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 859, *reh'g denied,* 357 U.S. 933, 78 S.Ct. 1367, 2 L.Ed.2d 1375 (1958).

"Therefore in such cases two questions of fact arise: (1) did the agent induce the accused to commit the offence charged in the indictment; (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offence. On the first question the accused has the burden; on the second the prosecution has it."

*Id.* at 882–83.

In *Simmons, supra,* we adopted this test:

"The principles by which these questions of fact are to be determined by the courts were outlined in *Sorrells.* See 287 U.S. at 451 [53 S.Ct. at 216]. As stated in *Sherman,* 356 U.S. at 373 [78 S.Ct. at 821], they are:

'On the one hand, at trial the accused may examine the conduct of the government agent; and on the other hand, the accused will be subjected to an 'appropriate and searching inquiry into his own conduct and predisposition' as bearing on his claim of innocence.' "

*Id.,* 8 Md.App. at 362, 259 A.2d 814.

Since that time, the Court of Appeals approved the test in *Grohman v. State,* 258 Md. 552, 267 A.2d 193 (1970), *cert. denied,* 401 U.S. 982, 91 S.Ct. 1204, 28 L.Ed.2d 334 (1971). Later, the Supreme Court in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), adhered to the view expressed by the majority in *Sorrells,* and this Court has further explicated the *Simmons* holding in *Fisher v. State,* 28 Md.App. 243, 345 A.2d 110 (1975), *cert. denied,* 276 Md. 743 (1976), and *Dravo v. State,* 46 Md.App. 622, 420 A.2d 1012 (1980). More recently, in *Bowser v. State,* 50 Md.App. 363, 369, 439 A.2d 1 (1981), this Court approved the two questions posed in *Grohman:*

"(1) [W]hether there was an inducement on the part of the government officials [or their agents] and if so
"(2) [W]hether the defendant showed any predisposition to commit the offense." *Grohman,* 258 Md. at 557, 276 A.2d 193.

The question then arises as to when entrapment exists as a matter of law and when it is an issue for the jury. In *Fisher*, 28 Md.App. at 249–50, 345 A.2d 110, Judge Powers provided an answer:

"The initial test of the evidence, within the framework of the substantive law of entrapment, is always a matter of law for the court. The question to be decided depends upon how the question is raised. A motion for judgment of acquittal based upon that defense requires the court to decide whether there is undisputed evidence, so clear and decisive that reasonable minds, applying the correct law, could not differ in finding that the defendant was induced by the police to commit the offense, and that his criminal conduct was due to the persuasion of the police, and not to his own readiness or predisposition to commit the offense. Only when such is the state of the evidence is there entrapment as a matter of law." (footnote omitted)

*–The Present Case–*

*–Entrapment as a Matter of Fact–*

Appellant does not contend that the court erred by not submitting the issue to the jury. He did not request that the issue be submitted. He neither asked for an instruction on the subject nor objected when none was given. Had appellant made such a request and the trial court denied it, then he could have argued in this Court that the evidence generated, from whatever source, sufficiently raised an issue of entrapment and, therefore, required an instruction.

■ In the instant case, appellant's defense focused on his denial that he committed any of the criminal acts charged. It is understandable that he did not request an instruction on entrapment. Thus, he cannot assert the issue on appeal as a factual matter.

*–Entrapment as a Matter of Law–*

■ Appellant contends that this is a case of entrapment as a matter of law. In support of his proposition, he urges,

and we agree, that entrapment becomes an issue for the trier of fact only if there is sufficient evidence to support a finding that the police induced the defendant to commit the offense charged. He then points to the fact pattern in this case and asks the two questions posed in *Grohman, supra:* (1) whether there was an inducement by government officials and their agents, and (2) whether the defendant showed a predisposition to commit the crime. Appellant answers "yes" to the first and "no" to the second, and he concludes there is entrapment as a matter of law.

–The Procedure–

Accepting the accuracy of these answers, for purposes of discussion, appellant has an insurmountable problem—he must use the proper method of raising the entrapment defense.

There is no constitutional defense of entrapment but, as we have indicated, the Supreme Court of the United States has recognized the defense as have we. Under the test adopted in Maryland, entrapment does not render the indictment a nullity, and does not require exclusion of the evidence. *Simmons,* 8 Md.App. at 364, 259 A.2d 814. As a result, neither a motion to dismiss the indictment nor to suppress the evidence lies. Once the defense has been raised, the question is for the trier of fact to decide. It is, therefore, a matter of sufficiency of the evidence.

To seek acquittal based on entrapment, the defendant first makes his motion at the close of the State's case. The court considers the motion for acquittal viewing the evidence in the light most favorable to the State. Procedurally, the assertion of the entrapment defense involves two steps:

Step 1. The defendant has the burden of establishing by a preponderance of the evidence that the police or their agent induced him to commit the offense. Failure to sustain this burden warrants dismissal of the motion at the end of the inquiry. If he meets the burden, we proceed to Step 2.

Step 2. The State bears the burden of proving beyond a reasonable doubt that the defendant's conduct was due to his own predisposition. If the State sustains its burden, the motion is denied. Upon failing to meet the burden, however, the motion is granted as a matter of law. *Simmons,* 8 Md.App. at 364–65, 259 A.2d 814.

■■■ If the court denies the motion, the defendant may choose whether to offer evidence or not. The presentation of any additional evidence by the defense after the close of the State's case effectively withdraws the motion. Rule 756 a [4]; *Howell v. State,* 56 Md.App. 675, 684–685, 468 A.2d 688, *cert. denied,* 299 Md. 426, 474 A.2d 218 (1984). To preserve the entrapment issue, in a jury case, the defendant must make or renew the motion at the end of the case. The court follows the two steps set forth above.[5] This time, however, the court considers the issue based on the evidence presented by both the State and the defendant, and determines whether the facts permit only one conclusion. In a criminal case tried before a jury, the defendant's failure to move for judgment of acquittal at the close of all the evidence precludes appellate review of the sufficiency of the evidence. *Wersten v. State,* 228 Md. 226, 229, 179 A.2d 364 (1962), *aff'd. on other grounds,* 232 Md. 164, 192 A.2d 286 (1963); *Cooper v. State,* 44 Md.App. 59, 68, 407 A.2d 756 (1974); *Magness v. State,* 2 Md.App. 320, 324, 234 A.2d 481 (1967).

■■■ In the present case, appellant was tried before a jury. His motion for judgment of acquittal at the close of the State's case was denied as to all counts. Appellant then presented a defense through witnesses Howard Lyles, James Johnson, Joseph Colburn, Anita Ady and himself. He did not renew his motion for judgment of acquittal at

---

**4.** Effective July 1, 1984, Rule 756 was superceded by Rule 4–324 without significant change as it relates to this case.

**5.** One exception exists to this requirement that the defendant renew his motion for acquittal following his presentation of evidence. In a bench trial, this Court will review such a case upon both the law and the evidence, and will set it aside only if it is clearly erroneous. Md.Rule 1086. This exception does not apply in the present case.

the conclusion of his case. Consequently, appellant waived the question of sufficiency of the evidence to support his convictions on appeal. *Wersten, supra; Cooper, supra; Magness, supra.*

We further note that, even if appellant had renewed the motion at the proper time, and it was denied, the only issue on appeal would have been whether the court erred in denying the motion for judgment of acquittal based on all the evidence—both the State's case and that of the defense. Appellant would not be entitled to a review of whether the evidence presented in the State's case alone was sufficient to survive a motion for judgment of acquittal; this issue is reviewable only when the defendant offers no additional evidence.

Appellant focuses only on the State's case to establish that there was entrapment as a matter of law. He would have us ignore all the evidence which he produced, in which he asserted he did not commit the act that he now claims he was entrapped into doing. By presenting a defense, appellant not only withdrew his motion, but effectively precluded appellate review of the sufficiency argument based solely on the State's case.

JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.