7 A.3d 617

**Ray Lamont MOORE**

v.

**STATE of Maryland.**

**No. 1759, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Oct. 29, 2010.

Nenutzka Villamar (Paul DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Jeremy M. McCoy (Douglas Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: HOLLANDER, EYLER, JAMES R. and JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

JAMES A. KENNEY, III, J. (Retired, Specially Assigned).

A jury sitting in the Circuit Court for Baltimore County convicted Ray Lamont Moore, appellant, of possession of cocaine, possession of heroin, possession with intent to distribute cocaine, and possession with intent to distribute heroin. After merger of the simple possession charges, appellant received a sentence of 25 years without the possibility of parole for possession of cocaine with intent to distribute and a suspended sentence of five years for possession of heroin with intent to distribute. Prior to trial, the court denied appellant's motion to suppress evidence seized when he was subjected to a strip search at a police station.

Appellant presents three questions for our review, which we have slightly reworded:

I. Did the court err in denying appellant's motion to suppress evidence discovered during a strip search?

II. Did the court err in denying appellant's request to compel the State to reveal the identity of the confidential informant?

III. Was the evidence sufficient to sustain appellant's convictions for possession with intent to distribute cocaine and heroin?

We answer "no" to the first two questions, "yes" to the third, and affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

The Circuit Court for Baltimore County issued a search and seizure warrant on January 24, 2006, for the search of "[t]he person known as 'Ray Ray,' a black male described as being in his 20's with a medium build" and "[a] silver 4–door Kia with Maryland registration MPC835" for drugs, weapons, and drug paraphernalia. Probable cause to issue the warrant was based upon the affidavit of Detective C.M. Toland and Detective Steven Sodd of the Baltimore County Police Department.

In that affidavit, the detectives stated that a confidential informant had informed them that appellant "sells crack cocaine in Baltimore County." According to the informant, "Ray Ray [could] be called on his cell phone, . . . and [he] will come out to sell crack cocaine, driving a silver 4–door Kia with Maryland registration MPC 835." The informant also advised that "he/she has observed Ray Ray talking about having guns and actually observed what he/she believed was a handgun in Ray Ray's silver Kia on one occasion."

The detectives affirmed that "[the informant] has provided information in the past which has lead [sic] to the successful recovery of narcotics in quantities that indicate an intention to distribute same and have led to several arrests; therefore, [the detectives] deem [the informant's] information reliable." They also stated that, in January, they had set up and executed a "controlled purchase of crack cocaine from Ray Ray." The informant arranged a meeting with appellant, while under surveillance by the detectives, to purchase cocaine with money given to the informant by the detectives. Appellant drove the described vehicle to the arranged meeting location where he sold cocaine to the informant.

On January 25, 2006, at 7:00 p.m., while driving a silver Kia in Baltimore County, appellant was stopped by the Baltimore County police for the purpose of executing the search warrant. After "a search of [appellant] at the scene there per his outer-

garments, his clothing," and a search of the vehicle produced no drugs or paraphernalia, Detective Toland took appellant to the local police precinct. In a private room and in the presence of the detective and another male police officer, appellant was directed to take off his clothes, bend over, and spread the cheeks of his buttocks. When he did, the detective "observed some plastic bag piece sticking out of his butt." Detective Toland "at that point ... removed the plastic bag which contained two plastic baggies." One of those bags contained eleven baggies of cocaine and the other contained ten baggies of heroin.

Appellant moved to require the State to produce the identity of the informant and to suppress the evidence recovered. Both motions were denied. Details of the motions hearing are set out in the Discussion section of this Opinion.

Trial took place on April 16 and 17, 2006. At trial, Detective Toland testified that, according to the officers who had stopped appellant, when appellant was stopped, he was observed "bending over in the vehicle with his hands tucked around his body." He refused to exit the vehicle, and a window had to be broken to remove him. Detective Toland was told that a cell phone was recovered in a search of appellant's vehicle, and that appellant had less than $200 on him.

Detective Toland was qualified and accepted by the court as an expert in the detection, sale, and packaging of narcotics. He testified that, in his opinion, each of the eleven baggies of crack cocaine had an approximate street value of $40 and each of the ten baggies of heroin had an approximate street value of $20. He opined that the amount of narcotics recovered, the two different types, and the way that the narcotics were packaged indicated an intent to distribute the drugs.

Detective Toland acknowledged that appellant said that he had a "bad" drug problem and that the drugs were for his personal use. Detective Toland, however, observed no visible indications of drug use on appellant's body.

The State's chemist testified that the drugs recovered from appellant tested positive for cocaine and heroin. The total weight of the cocaine was 4.4 grams and the total weight of the heroin was 1.4 grams.

Appellant did not testify or otherwise offer evidence.

## DISCUSSION

### Motion to Suppress

### Standard of Review

In *Paulino v. State*, 399 Md. 341, 347–49, 924 A.2d 308 (2007), the Court of Appeals explained:

"Our review of a circuit court's denial of a motion to suppress evidence, ordinarily, is limited to the evidence presented at the suppression hearing. *See Ferris v. State*, 355 Md. 356, 368, 735 A.2d 491, 497 (1999). Thus, we refrain from engaging in *de novo* fact finding and looking at the trial record for supplemental information." *Carter v. State*, 367 Md. 447, 457, 788 A.2d 646, 651 (2002). We review the evidence presented at the hearing on [the] motion to suppress, and all reasonable inferences drawn from that evidence, in the light most favorable to the State. *See Carter*, 367 Md. at 457, 788 A.2d at 651; *Scott v. State*, 366 Md. 121, 143, 782 A.2d 862, 875 (2001); *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239, 1240–1241 (1990).

* * *

As this Court noted in *State v. Nieves*, 383 Md. 573, 581–82, 861 A.2d 62, 67 (2004), "[a]lthough we extend great deference to the hearing judge's findings of fact and will not disturb them unless clearly erroneous, we review, independently, the application of the law to those facts to determine if the evidence at issue was obtained in violation of the law, and, accordingly, should be suppressed."

### Suppression Hearing

The sole witness at the suppression hearing was Detective Toland. He testified that on January 25, 2006, at 7:00 p.m.,

appellant was stopped by Baltimore County police **officers** at the intersection of Mussula and Yakona Roads in Baltimore County because both his physical characteristics and the vehicle he was driving matched the description in a search and seizure warrant that authorized a search of appellant and the vehicle for drugs. Appellant's vehicle and outer clothing were searched at the scene and nothing was recovered.

In response to questioning by defense counsel, Detective Toland testified that he arrived at the scene shortly after the stop and took appellant to the Towson precinct. A search of appellant was carried out in a private interview room:

> There's an interview room. [Appellant] was in the interview room with myself and another officer. At that point, he was strip searched. His clothes were removed. When I asked him to turn around and to bend over, I observed some plastic bag piece sticking out of his butt. And at that point, I removed the plastic bag which contained exactly two plastic bags. One contained 11 baggies of crack cocaine and one contained ten baggies of heroin.

The record reveals the following exchange on cross-examination by the State:

[State Attorney]: The interview room, is this a private room with a door?

Detective Toland: Yes.

\* \* \*

Q. Now, when he was asked to disrobe, was he asked—was he facing you or was he turned away from you at that time?

A. He was facing me.

Q. Did you ask him to turn around?

A. After he was undressed, yes.

Q. And what exactly did you say to him at the time?

A. I told him to turn around and bend over and spread his cheeks, his butt cheeks.

Q. Okay. And was that the point that the items became visible?

A. Clearly visible.

On redirect examination:

[Defense Counsel]: So it—from what was just described, if he would get undressed and walk around without spreading his butt cheeks, you wouldn't have seen it.

Detective Toland: Correct.

* * *

[Defense Counsel]: Did you ask him to walk?

Detective Toland: No, I did not ask him to walk.

Detective Toland also testified that nothing fell out of appellant's underwear and nothing fell down when appellant was standing in the interview room.

Defense counsel argued that the search warrant only allowed a search of the outside of appellant's person, and that a strip and visual body cavity search were outside the scope of the warrant.[1]

The court, in denying the motion to suppress, stated:

Well, there's no case law in this particular type of search in Maryland. The *Nieves* case up in Washington County was a warrantless search. The *Roachin* case and the other case cited by Counsel involve an actual invasion or incursion into the body, of making the person drink the ipecac or some other matter to actually invade a bodily cavity. There's no invasion at all here.

Testimony is when the man turned around and bent over, these bags were in plain view. They were hanging there . . . .

---

1. Defense counsel stated: "[T]here's no authority given to Judge Jung. And if you don't find anything on his person with standard searching procedures, strip search him and go into his body cavity. [The warrant d]oesn't say that."

## Analysis

This case involves the particularity required of warrants by the Fourth Amendment to the United States Constitution.[2] The warrant issued in this case was issued for the search of the appellant's "person" and "vehicle" for drugs and drug paraphernalia. Appellant asks whether the search conducted in this case exceeded the scope of the warrant.

The warrant provided:

Application and Affidavit having been made before me by Your Affiants, Detective C.M. Toland # 3932 and Detective Steve Sodd # 4072, members of the Baltimore County, Maryland Police Department, being duly sworn, depose/s and say/s that there is *probable cause to believe that in/on* **1) The person known as "Ray Ray," a black male described as being in his 20's with a medium build and 2) A silver 4-door Kia with Maryland registration MPC835, VIN # KNACD128945309662, in Baltimore County,** there is now property subject to seizure, such as Cocaine, a Schedule II Controlled Dangerous Substance, packaging materials, scales, paraphernalia and instruments used in the distribution and/or possession of the above Controlled Dangerous Substance which are in violation of the Laws of Maryland pertaining to Controlled Dangerous Substances, Criminal Code CR 5–303(d) to CR 5–903(a). Also subject to seizure are any notes, records and documents that relate to the distribution of Controlled Dangerous Substances; monies which are the profits of sales of the above Controlled Dangerous Substance; and any papers that show residency. *I am satisfied that there is probable cause to believe that the property so described is in or on the [premises/vehicle/person] above described and that the grounds for the issuance*

---

**2.** The Fourth Amendment to the United States Constitution provides:
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
 U.S. Const. amend. IV.

*of the Search Warrant exist, being those grounds as stated on the Application and Affidavit attached hereto and incorporated herein by reference.*

You are, therefore, **commanded, with the necessary and proper assistance to search forthwith the [premises/vehicle/person] herein above described for the property herein above specified; further, to search all locked and unlocked containers capable of concealing any type of Controlled Dangerous Substance; executing this warrant and making the search; and, if the property be found there, to seize it; and, if upon execution of this warrant, there are found person then and there engaged in the commission of a crime, arrest those so participating; leaving a copy of this Warrant and Application/Affidavit therefore with an inventory of the property seized and returning a copy of said Warrant, Application/Affidavit and inventory, if any, to me within ten days after its expiration, as required by law.**

(Bold in original; Italics added.)

Appellant argues that "the 'in/on' language was boilerplate language, where the prepositions 'in' and 'on' were referring in the alternative to the subjects of the prepositions 'automobiles,' 'premises,' and 'persons,' and was not intended to mean that the police were granted authority to search for evidence that was on or in [his] person."

On appeal, the State argues that "the strip search was conducted properly at the police precinct as a valid search incident to [appellant]'s arrest." It also contends that, "even if, *arguendo*, [the strip search] had been performed exclusively pursuant to the valid warrant, and not incident to his subsequent arrest, the scope of the warrant's authority to search [appellant]'s person would have nonetheless lawfully permitted the strip search in this instance."

### Search Incident to Arrest

It appears that the State's search incident to arrest argument is one of appellate afterthought as our review of the record does not reveal that it was argued to the motions court

at the suppression hearing. According to the State, "Detective Toland testified that [appellant] was *arrested* and taken to a secure location at the police precinct in Towson...." (Emphasis added). It is true that defense counsel, during the suppression hearing, asked Detective Toland if he arrested appellant on January 25, 2006. That exchange reads as follows:

> [Defense Counsel]: [January] 25, 2006. On that day, it's my understanding that, in fact, you arrested Ray Moore, is that correct?
>
> [Detective Toland]: That is correct.
>
> Q. And could you tell His Honor what time it was that you arrested him? Time of day I meant.
>
> A. It was about 19:10 hours, about ten after seven, when we had taken Mr. Moore into custody.

After an "unintrusive search" was made "at the scene," appellant was taken "to a secure location" and the search at issue was carried out. After Detective Toland testified as to the details of the search and the recovery of the drugs, defense counsel asked: "So this procedure was taken by you and that's how it was recovered?" He responded: "Per the search warrant, yes." In his argument to the motions court, the prosecutor stated, "But in this case, there was a warrant. The officers had a warrant to search in or on the person." At no point did the State argue that the search was incident to arrest.

■ Whether detaining and transporting a person to a police precinct, for the sole purpose of conducting a strip search pursuant to a search warrant, constitutes an arrest of the person appears to be a question of first impression.[3] We are persuaded that it does not.

---

**3.** *But see Franklin v. State,* 18 Md.App. 651, 661, 308 A.2d 752 (1973) (regarding "search incident to a detention, based on probable cause but not amounting to an arrest, for readily destructible evidence") (citing *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973)).

Strip searches, and body cavity searches in particular, are to be conducted in places that are private and appropriately hygienic.[4] This will necessarily involve securing the search area from public view and may often involve transporting the person by vehicle to a more private and secure facility, such as a police station.

Though the person to be searched is under the control of the police and is not free to leave, the purpose of the detention and the resulting transportation is to carry out the search warrant. After the search is completed, if no evidence to support an arrest is discovered as a result of the search, the person would be free to leave.

In *Cotton v. State,* 386 Md. 249, 872 A.2d 87 (2005), the Court of Appeals examined the concept of arrest with respect to whether the detention of a person at the scene during the search of a building was an arrest or an investigative stop. In *Cotton,* a search warrant authorized the search of a building, its curtilage, and the persons found on the property for drugs and related paraphernalia. *Id.* at 252, 872 A.2d 87. Cotton was on the property at the time of the search. *Id.* at 254, 872 A.2d 87. He was given *Miranda* warnings, handcuffed, and detained for over twenty minutes. *Id.* He argued that this detention constituted an unlawful arrest. *Id.* at 255, 872 A.2d 87. The Court disagreed.

In its analysis, the Court quoted *United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), where the U.S. Supreme Court, in the context of investigative stops, stated:

"In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or

---

**4.** *See McGee v. State,* 105 S.W.3d 609, 617 (Tex.Crim.App.2003); *Paulino,* 399 Md. at 358, 924 A.2d 308.

dispel their suspicions quickly, during which time it was necessary to detain the defendant[.]"
*Cotton,* 386 Md. at 259, 872 A.2d 87.

The *Cotton* Court also cited *Muehler v. Mena,* 544 U.S. 93, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005). There, a woman was placed in handcuffs at gunpoint and detained under guard for two to three hours in a converted garage while the search of the premises took place. *Cotton,* 386 Md. at 260, 872 A.2d 87 (citing *Muehler,* 544 U.S. at 99, 125 S.Ct. 1465). The *Muehler* Court held that the woman's Fourth Amendment rights were not violated and that "the fact that the detention lasted two-to-three hours was not, itself, unreasonable, if it did not last longer than the search of the house required." *Id.* (citing *Muehler,* 544 U.S. at 99, 125 S.Ct. 1465).

In *Fromm v. State,* 96 Md.App. 249, 624 A.2d 1296 (1993), the defendant asserted that he was illegally detained by police officers when they arrived at his apartment building to execute a search warrant authorizing the search of his apartment. He was a short distance away from his apartment, heading out of a neighboring apartment building and toward a parking lot, when police officers executing the warrant detained him and "transport[ed] him the short distance to his apartment." *Id.* at 254–55, 624 A.2d 1296. "At some point during the process, appellant was placed in handcuffs." *Id.* at 251, 624 A.2d 1296.

The *Fromm* Court applied *Michigan v. Summers,* 452 U.S. 692, 705, 101 S.Ct. 2587, 2595, 69 L.Ed.2d 340 (1981), where the Supreme Court held that "for Fourth Amendment purposes, . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Fromm,* 96 Md.App. at 251, 624 A.2d 1296. The *Fromm* Court approved the analysis of the trial court, which had stated:

> [It] is permissible to detain persons *in and about* the premises that are specifically identified as having connection with the premises. And this defendant was specifically identified as being the owner or the lessee of the premises.

So that I think it was proper to bring him from outside inside during the conduct of the search.

*Id.* at 256, 624 A.2d 1296 (emphasis in original).

The *Fromm* Court also cited *Commonwealth v. Reicherter*, 317 Pa.Super. 256, 463 A.2d 1183 (1983), where "the Superior Court of Pennsylvania held that police with a warrant to search the defendant's apartment properly stopped the defendant just after he left the building, as he was riding in a friend's truck several blocks away." *Fromm*, 96 Md.App. at 255, 624 A.2d 1296. The *Reicherter* Court stated:

Although Reicherter was initially stopped by the police while several blocks from his apartment while the defendant in *Michigan v. Summers* ... was stopped on the front steps of his residence, this is not a difference such as would require a different result: in both cases some transportation of relatively short duration was required to return the defendant to the residence to be searched.

*Id.* (quoting *Reicherter*, 317 Pa.Super. at 260, 463 A.2d 1183).

■ The fact that appellant was handcuffed when transported does not necessitate a finding that he was placed under arrest. In *Smith v. State*, 186 Md.App. 498, 537, 974 A.2d 991 (2009), *aff'd*, 414 Md. 357, 995 A.2d 685 (2010), in considering whether a detention was an arrest, we stated that "the use of flex cuffs on the appellant and the other three individuals being detained did not transform a *Terry* stop into an arrest." We quoted from *Trott v. State*, 138 Md.App. 89, 770 A.2d 1045 (2001):

Appellant contends that even if the stop was justified, his handcuffing by Officer Middleton transformed that stop into an "arrest." That arrest was illegal, appellant claims, because the officer did not have, at that time, probable cause to arrest him.

We disagree for three reasons. First, *the handcuffing of appellant was justifiable as a protective and flight preventative measure pursuant to a lawful stop and did not necessarily transform that stop into an arrest.*

*Smith,* 186 Md.App. at 537, 974 A.2d 991 (emphasis supplied by *Smith* Court). The *Smith* Court then "surveyed ten federal cases and eight state cases in support of [its] conclusion that 'handcuffing does not necessarily transform a "stop" into an "arrest." ' " *Id.* at 538, 974 A.2d 991 (quoting *Trott,* 138 Md.App. at 89, 770 A.2d 1045); *see also In re David S.,* 367 Md. 523, 539–40, 789 A.2d 607 (2002).

Individuals present during the search of a premises authorized by a search warrant may be detained by police without being under arrest. It necessarily and logically follows that *persons* who are the subject of a search warrant may also be detained for the period of time reasonably necessary to carry out the search. As the cases discussed above illustrate, the transportation of individuals, even in handcuffs, is not necessarily tantamount to an arrest, and, in the context of executing search warrants, is often necessary to "prevent[ ] [ ] flight and to facilitat[e] the orderly completion of the search." *Fromm,* 96 Md.App. at 256, 624 A.2d 1296.

Detective Toland's testimony that he read appellant his *Miranda* rights before conducting the search does not change our determination of whether appellant was under arrest at the time the search of appellant was initiated. As the Court of Appeals explained in *Cotton,* 386 Md. at 265–66, 872 A.2d 87:

> The prophylactic requirement of *Miranda* warnings is designed to safeguard important Fifth Amendment protections. *See Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed. [L.Ed.2d] 405 (2000). Although the giving of those warnings may be considered along with more relevant factors as part of all that occurred, it should have no special significance in determining whether a temporary detention constitutes an arrest for Fourth Amendment purposes because it may well be required even when there is clearly no arrest.

Nor are we persuaded that appellant was under arrest because he was transported to a nearby police precinct to carry out the search of appellant's person instead of a fire-

house or other private location. To have carried out the search at the scene of the initial detention without taking extraordinary steps to ensure appellant's privacy would have been unreasonable.

To be sure, there was probable cause to seek an arrest warrant for appellant based on the earlier controlled buy referred to in the attached probable cause statement to the application for the search warrant. But, no charges were ever brought against appellant related to that controlled buy. Instead, as the prosecutor pointed out to the motions court, in order to protect the confidential informant, the officers procured a search warrant, instead of an arrest warrant, "for the purpose of not having to identify the informant in the case." It seems clear that, contrary to the State's argument on appeal that the search was incident to arrest, Detective Toland was relying on the expected results of the search conducted pursuant to the search warrant to effect an actual arrest.

Our conclusion that appellant was not arrested until the search produced clear evidence of drug trafficking is supported by the recent decision of the Court of Appeals in *Belote v. State,* 411 Md. 104, 107, 981 A.2d 1247 (2009). There, the Court, addressing "[t]he question of what constitutes an arrest," stated:

> [A]n officer's objective "manifestation of purpose and authority" at the "moment of arrest," by words or conduct, which signal to an individual that he or she is under arrest, will be, and always has been, significant in determining whether a custodial arrest has occurred in Maryland.

*Id.* at 113, 981 A.2d 1247 (citing Wayne A. Logan, *An Exception Swallows a Rule: Police Authority to Search Incident to Arrest,* 19 Yale L. & Pol'y Rev. 381, 431–32 (2001); *Bouldin v. State,* 276 Md. 511, 518, 350 A.2d 130 (1976), *limited by State v. Evans,* 352 Md. 496, 514, 723 A.2d 423 (1999) ("Despite *Bouldin's* reference, in *dicta,* ... whether the officer intends that a detention lead to a prosecution has no bearing on whether an arrest has occurred."); *State v. Crutcher,* 989 S.W.2d 295, 302 (Tenn.1999)) (other citations omitted). The

Court then reaffirmed its holding in *Bouldin,* stating, "The definition of arrest that we articulated in *Bouldin* applies to all custodial arrests in Maryland." *Id.* at 118, 981 A.2d 1247.

In *Bouldin,* a police officer searched the personal belongings of Bouldin, an accident victim, while he was unconscious at the hospital. *Bouldin,* 276 Md. at 512–14, 350 A.2d 130. After finding drugs, the officer placed Bouldin under 24–hour guard. *Id.* at 513, 350 A.2d 130. Bouldin moved to suppress the drugs, arguing that the search of his belongings was not incident to his arrest. *Id.* at 512, 350 A.2d 130. The *Belote* Court, 411 Md. at 116–17, 981 A.2d 1247, summarized the *Bouldin* Court's holding that the evidence should be suppressed:

> [A]n arrest in Maryland ordinarily requires four elements to coalesce: "(1) an intent to arrest; (2) under a real or pretended authority; (3) accompanied by a seizure or detention of the person; and (4) which is understood by the person arrested." *Id.* at 516, 350 A.2d at 133 (citing 6A C.J.S. Arrest § 42 (1975)); *Longshore v. State,* 399 Md. 486, 502, 924 A.2d 1129, 1137–38 (2007). We reasoned that [the officer] lacked the subjective intent to arrest Bouldin and failed to demonstrate, in his conduct or words, any objective acts that would reflect an intention to perform a custodial arrest of the unconscious Bouldin. *Bouldin,* 276 Md. at 518, 350 A.2d at 134. In concluding that Bouldin was not arrested at the time that [the officer] searched his belongings, we emphasized that [the officer's] conduct immediately prior to, and contemporaneously with, the search did not resemble the kind of conduct that indicated an intent to make a custodial arrest. *Id.* at 518–19, 350 A.2d at 134. In fact, we noted, [the officer] "said nothing and did nothing before searching Bouldin's clothing to indicate to anyone in control of Bouldin's medical care and movements that Bouldin was under arrest." *Id.*

In *Bouldin,* we appropached the custodial arrest question by reviewing [the officer's] objective conduct and subjective intent. *Id.* The *Bouldin* court's analysis established that, where a police officer's objective conduct unambiguously reflects an intent to make a custodial arrest, the subjective

intent inquiry, which is one of the four elements reviewed to determine whether a custodial arrest occurred under *Bouldin*, takes on less significance. In other words, when an arresting officer's objective conduct, which provides significant insight into that officer's subjective intent, is unambiguous, courts need not allocate significant weight to an officer's subjective intent that is revealed partially in the form of his testimony at the suppression hearing; the officer's objective conduct, in effect, will have made his subjective intent clear. It is only when an arresting officer's objective conduct is ambiguous that his or her subjective intent increases in importance to a court's legal inquiry into whether a custodial arrest of the suspect occurred. The *Bouldin* court's focus on [the officer's] subjective intent was a direct result of the fact that [the officer] did not engage in or demonstrate any objective conduct that indicated that he was making a custodial arrest of the unconscious Bouldin[.]

A review of the record under the *Bouldin* four-prong test indicates that Detective Toland's objective conduct at the time he detained and transported appellant to the police station indicated an intent to complete the execution of the search and seizure warrant that had been started at the scene of the initial stop.[5] Other than Detective Toland giving appellant *Miranda* warnings, no evidence was presented on what was told to appellant at the time he was detained or during his detention. The suppression hearing record reveals the following exchange between defense counsel and Detective Toland:

[Defense Counsel]: Did you conduct a search of [appellant] on the premises of where he was? . . . .

---

5. The following exchange occurred at the suppression hearing:

[Defense Counsel]: (to Detective Toland) You were there—well, were—were you there to execute the warrant signed by Judge Barbara Jung?

Detective Toland: I showed up to the scene after our tactical team started the execution of the warrant.

\* \* \*

We observed Mr. Moore and the vehicle on that road, and that's when the warrant was executed.

Detective Toland: There was a search of [appellant] at the scene there per his outer garments, his clothing.

Q. As a result of that—we'll say pat down or unintrusive search, was anything recovered?

A. Not at that time, no.

Q. Okay. Mr. Moore was then, I assume, taken to a secure location.

A. The Towson Precinct.

Q. Right. Would you consider that a secure location?

A. Yes.

Q. Okay. And at that location, was he then under your control with other officers of course?

A. Yes.

Q. Okay. Mr. Moore was then searched, is that correct.

A. Yes.

On redirect examination of Detective Toland:

[Defense Counsel]: (Referencing Detective Toland's prior testimony concerning the search of appellant)

So this procedure was taken by you and that's how [the evidence] was recovered.

Detective Toland: Per the search warrant, yes.

█ No other testimony concerning the detention and transportation of appellant from his vehicle to the precinct, including appellant's understanding of that detention, was offered at the suppression hearing.[6] That the officers may have intended that the detention lead to a prosecution because they expected to find drugs is not relevant as to whether there was an arrest.

Appellant was detained and transported to the police precinct for the purpose of completing the search and he was not

---

6. At trial, Detective Toland explained that appellant was taken from the scene of the original stop to the Towson Precinct "to complete the execution of the service of the warrant." When asked why appellant was taken there, Officer Toland responded that "[t]he search warrant listed his person to be searched, so in order to . . . carry out the . . . search warrant, we had to take him back to the precinct."

arrested until the search revealed clear evidence of drug trafficking. The officers "had to take him back to the precinct" because they considered that location an appropriate private location to carry out the search. In sum, the search at issue was not initiated as a "search incident to arrest." That it subsequently became a search incident to arrest after the visual cavity search revealed a "plastic bag piece sticking out of [appellant's] butt" is discussed further in the Opinion. *See Conboy v. State,* 155 Md.App. 353, 364, 843 A.2d 216 (2004).

## Search Pursuant to the Warrant

■ We have not been directed to, nor have we found, any Maryland case directly addressing whether a warrant to search "a person" provides authorization to conduct a strip search or some degree of a body cavity search of the person. There is, however, Maryland case law to guide our consideration of the question presented.

■ In the context of a search incident to arrest, the Court of Appeals addressed the constitutionality of a strip search and body cavity search in *Paulino,* 399 Md. at 349, 924 A.2d 308. As explained by the Court, "[t]here exist three separate categories of searches," *id.* at 352, 924 A.2d 308, as described by the United States Court of Appeals for the First Circuit in *Blackburn v. Snow,* 771 F.2d 556, 561 n. 3 (1st Cir.1985):

A "strip search," though an umbrella term, generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities. A "visual body cavity search" extends to a visual inspection of the anal and genital areas. A "manual body cavity search" includes some degree of touching or probing of body cavities.

In *Paulino,* police received a tip from a confidential informant that Paulino would be at a particular location, that he would have in his possession a quantity of a controlled dangerous substance, and that "Paulino typically hides the controlled dangerous substance in the area of his buttocks." *Id.* at 344, 924 A.2d 308. When Paulino pulled into a car wash bay, the police removed him from the vehicle. Wearing gloves, they

"lift[ed] up his shorts," spread his butt cheeks, and discovered cocaine. *Id.* at 346, 924 A.2d 308.

The *Paulino* Court classified that search as "both a strip search and a visual body cavity search" because "the drugs were not visible until after the cheeks of Paulino's buttocks were spread apart." *Id.* at 353–54, 924 A.2d 308. In addressing the reasonableness of the search, the Court looked to the United States Supreme Court's decision in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), for "the appropriate test" to determine "the reasonableness of a search." [7] *Id.*

According to the *Paulino* Court, all searches that "entail[ ] the inspection of the anal and/or genital areas have been accurately described as demeaning, dehumanizing, undignified, humiliating, embarrassing, repulsive, degrading, and extremely intrusive of one's personal privacy." *Paulino,* 399 Md. at 356, 924 A.2d 308 (citing *Amaechi v. West,* 87 F.Supp.2d 556, 565 (E.D.Va.2000), *aff'd,* 237 F.3d 356 (2001)). In considering the scope of the search, the Court concluded that "the police officers' search of Paulino was highly intrusive and demeaning." *Id.*

The Court emphasized that the issue was "not whether the police had the right to search Paulino, but instead whether an

---

**7.** In *State v. Nieves,* 383 Md. 573, 588, 861 A.2d 62 (2004), the Court explained:

> In *Bell* [ ], the Supreme Court addressed the permissible scope of searches incident to arrest that occurred in associations with pretrial detention. [441 U.S.] at 523, 99 S.Ct. at 1866, 60 L.Ed.2d at 458. Several defendants brought a class action suit challenging detention policies requiring pre-trial detainees to be subjected to a "visual body cavity" search every time the detainee had contact with individuals outside of the institution. *Id.* The Court assessed the reasonableness of these searches by stating:
>
> > The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

exigency existed such that an invasive search, conducted at the scene of the arrest, was reasonable." *Id.* at 357, 924 A.2d 308. Because the police had made no "attempt to limit the public's access to the car wash or [to take] any similar precaution that would limit the ability of the public or any casual observer from viewing the search of Paulino[,]" the search was determined to be unreasonable. *Id.* at 357–58, 924 A.2d 308.

In reaching that determination, the Court found the Texas Court of Criminal Appeals case of *McGee,* 105 S.W.3d at 616, "instructive." *Id.* In *McGee,* police officers, acting on an informant's tip, approached McGee, a suspected drug dealer. They observed " 'marijuana smoke in the air above McGee and a marijuana cigarette on the ground next to him.' " *Id.* (quoting *McGee,* 105 S.W.3d at 614.). They "arrested McGee," "drove him to a nearby fire station," and, "[i]n a secluded area of the station," ordered him to " 'drop his pants, bend over, and spread his buttocks.' " *Id.* at 358, 924 A.2d 308 (quoting *McGee,* 105 S.W.3d at 613). In finding the search reasonable, "the court held that the searching officer acted appropriately to protect the privacy interest of McGee because he took him to a separate location within the firehouse that was more secluded." *Id.* (citing *McGee,* 105 S.W.3d at 617).

Here, the search warrant authorized a search of a known drug dealer's person for illegal drugs and associated paraphernalia. It is well known in the law enforcement community, and probably to the public at large, that drug traffickers often secrete drugs in body cavities to avoid detection. In the "Probable Cause" section of the Application and Affidavit for Search and Seizure Warrant in this case, the affiants stated, generally, that they knew "through their training, knowledge and experience" that drug traffickers "[s]ecrete contraband . . . in secure locations *within their person* . . . for ready access and to conceal the same from law enforcement authorities." (Emphasis added).[8] Based on the facts of this case,

---

8. However, there was no statement, as there was in *Paulino,* 399 Md. at 344, 924 A.2d 308, that the officers had reason to believe appellant hid drugs within his person.

and guided by *Paulino* and *Bell*, we are persuaded that the search of appellant pursuant to the warrant was reasonable, considering the nature of the items being searched for and the places in which they are often hidden.

In determining the reasonableness of the search, we have looked to *Bell* and considered "the scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it is conducted." *Bell,* 441 U.S. at 559, 99 S.Ct. 1861.

As to scope, appellant was subjected to a strip search when he was told to take off his clothes. Nothing fell out of his underwear when he disrobed and nothing fell down where he was standing in the interview room facing the officers. When he was told to "turn around and bend over and spread his . . . butt cheeks," the strip search became a visual body cavity search.[9] *Paulino,* 399 Md. at 356, 924 A.2d 308.

As to the manner and the place in which the strip search was conducted, appellant was in a private room and observed by only two male officers.[10] The search was progressive, beginning with a search of appellant's outer garments, moving on to a strip search, and then to a visual body cavity search when the drugs were not found in the previous search efforts. The observation of a "plastic bag piece" sticking out of a known drug dealer's "butt" clearly provided probable cause to arrest for, at least, possession of drugs and changed the calculus of the search from reliance on the warrant to a search incident to appellant's inevitable arrest. In other words, any continuing search at that point in time, including the removal of the protruding plastic bag, was based

---

**9.** Detective Toland was asked, "If appellant had walked around undressed, would [he] have been able to see the plastic bags sticking out of [appellant's] butt?" He indicated that he would not have been able to.

**10.** *See Paulino,* 399 Md. at 358, 924 A.2d 308 (citing *McGee,* 105 S.W.3d at 617; *Logan v. Shealy,* 660 F.2d 1007, 1014 (4th Cir.1981) (noting that strip searches and body cavity searches involve such an intrusion that they should rarely be conducted in public places)).

upon probable cause to arrest and incident to that arrest and no longer dependent on the warrant. *See Conboy,* 155 Md. App. at 364, 843 A.2d 216 ("[A]s long as police have probable cause to arrest before they search the arrestee, it is not 'particularly important that the search precede the arrest rather than vice versa.'" (quoting *Rawlings v. Kentucky,* 448 U.S. 98, 111, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980))); *See also Nieves,* 383 Md. at 579, 861 A.2d 62 ("A search incident to a lawful arrest is one of the well delineated exceptions to the warrant requirement."); *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (The United States Supreme Court articulated the bases for a search incident to arrest, as being, "to remove any weapons that the [arrestee] might seek to use in order to resist arrest or effect his escape . . . [or] to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction."); *Stokeling v. State,* 189 Md.App. 653, 669–670, 985 A.2d 175 (2009) (Holding that a strip search was conducted as a search incident to arrest, because, after an officer performed a *Terry* frisk which resulted in him feeling what he thought was a bag in appellant's crotch area, the officer had probable cause to arrest appellant for suspicion of drug possession.); *McGee,* 105 S.W.3d at 612 ("[C]rack cocaine retrieved from between [appellant's] buttocks" as the result of "a visual body cavity inspection" was upheld, where the search was incident to arrest and supported by probable cause.); *North Carolina v. Johnson,* 143 N.C.App. 307, 547 S.E.2d 445 (2001) (Where a search warrant authorized a search of appellant's person for drugs, drugs recovered from appellant's rectum pursuant to a strip search where appellant was made to "bend over at the waist" were admissible and the search was within the scope of the warrant.); *But see People v. More,* 97 N.Y.2d 209, 214, 738 N.Y.S.2d 667, 764 N.E.2d 967 (2002) (A body cavity search incident to arrest was unreasonable because a particularized warrant could have been procured.); *People v. Hall,* 10 N.Y.3d 303, 311, 856 N.Y.S.2d 540, 886 N.E.2d 162 (N.Y.2008) ("If an object is visually detected or other information provides probable cause that an object is hidden inside the arrestee's body,

*Schmerber* [*v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) ], dictates that a warrant be obtained before conducting a body cavity search unless an emergency situation exists. Under our decision in *More,* [97 N.Y.2d at 214, 738 N.Y.S.2d 667, 764 N.E.2d 967], the removal of an object protruding from a body cavity, regardless of whether any insertion into the body cavity is necessary, is subject to the *Schmerber* rule and cannot be accomplished without a warrant unless exigent circumstances reasonably prevent the police from seeking prior judicial authorization."), *cert. denied,* —— U.S. ——, 129 S.Ct. 159, 172 L.Ed.2d 241 (2008); *Arizona v. Barnes,* 215 Ariz. 279, 281, 159 P.3d 589 (2007) ("an officer must secure a warrant to remove items partially protruding from an arrestee's rectum."), *review granted,* 2008 Ariz. LEXIS 2 (Jan. 8, 2008), *review improvidently granted and vacated,* 2008 Ariz. LEXIS 38 (Feb. 20, 2008).

The *Paulino* classifications of strip searches focus on the search itself and not the following seizure of the drugs discovered as a result of the search. Here, it was not necessary for the officers to touch appellant or to invade his body cavity in any way to discover where the drugs were secreted. Once the plastic bag was seen, it was removed by Detective Toland. The record does not indicate that any "degree of touching or probing of the body cavit[y]" in which the drugs were hidden was necessary to recover them. *See Paulino,* 399 Md. at 352, 924 A.2d 308. Moreover, appellant does not contend that the officers removed the drugs in an unhygienic environment, performed any procedure that would have been more appropriately conducted in a hospital or other health care facility, or endangered his health in any way.

Relevant to the issue of whether the warrant authorizing the search of appellant's "person" for drugs permitted the level of search conducted in this case, we find guidance in *Nieves,* 383 Md. at 575, 861 A.2d 62. In that case, the Court "consider[ed] whether a strip search conducted incident to a lawful arrest for a minor traffic violation is reasonable under the Fourth Amendment." *Id.* Nieves was arrested for "giving false information to the police and for obstructing a police

▆▆▆▆▆▆▆▆▆▆

officer" after the truck he was driving, which had been reported as belonging to a missing woman, rolled into the back of a police car at a traffic stop. *Id.* at 576, 861 A.2d 62. During booking procedures, an officer ordered a strip search of Nieves based on "the information regarding the missing person and [her] prior history of drugs." *Id.* at 577, 861 A.2d 62. The search "produced two small plastic baggies containing individually wrapped baggies of cocaine that were protruding from Nieves' rectum." *Id.*

The circuit court denied Nieves' motion to suppress, stating that "detaining the defendant under the totality of the circumstances and the subsequent search were reasonable." *Id.* at 579, 861 A.2d 62. Nieves appealed to this Court. We held that the "officers did have probable cause to arrest Nieves for the multiple traffic violations," that "a search incident to arrest was permissible under the circumstances," but that a strip search was unreasonable. *Id.* at 580, 861 A.2d 62. The Court of Appeals granted *certiorari* and affirmed. *Id.* at 581, 861 A.2d 62. Turning to the question of "whether the officers had reasonable, articulable suspicion to strip search Nieves incident to arrest for minor offenses," the Court of Appeals, summarizing our holding, stated:

> The court applied a balancing test by weighing Nieves' privacy interests against the government interest in conducting the strip search. In applying the balancing test, the intermediate appellate court held that strip searches incident to an arrest for a minor offense should not occur unless the arresting officer has a reasonable, articulable suspicion that the individual is presently in possession of weapons or contraband. The court further reasoned that conducting a strip search solely on Nieves' past criminal record would create a *per se* rule that would shift the determination of reasonable suspicion from the individual arrestee to a class or category of offenders. Additionally, the court noted that it was "far too great a leap to conclude that any possible narcotics involvement of the missing female *ipso facto* carried over to [Nieves] simply because he was the driver of the vehicle." Thus, the court concluded that based upon the

totality of the circumstances, the officers lacked reasonable, articulable suspicion to conduct the strip search and reversed the judgment of the trial court.

*Id.* at 580–81, 861 A.2d 62.

Conducting its own analysis, the *Nieves* Court discussed *Bell:*

> [In *Bell,* s]everal defendants brought a class action suit challenging detention policies requiring pre-trial detainees to be subjected to a 'visual body cavity' search every time the detainee had contact with individuals outside of the institution.... Because penal institutions face unique security challenges arising from the possibility of having contraband and weapons brought into the institution, the Court held that the searches were reasonable and could be conducted on less than probable cause that the detainee was carrying weapons or contraband. *Id.* at [561,] 99 S.Ct. at 1884–85, 60 L.Ed.2d at 481–82. Justice Powell, concurring in part and dissenting in part, suggested that reasonable suspicion should be the level required to justify the "visual body cavity" searches that occurred in the case. *Id.* at 563, 99 S.Ct. at 1886, 60 L.Ed.2d at 484.

*Nieves,* 383 Md. at 588, 861 A.2d 62.

The Court noted that, since *Bell,* "a number of courts [ ] have examined institutional policies attempting to prevent detainees from bringing weapons and contraband into the institution," and many courts "have required that the strip search be based upon reasonable suspicion that the individual was carrying weapons or contraband at the time of arrest." *Id.* at 588–89, 861 A.2d 62 (citations omitted.) It stated: "Reasonable suspicion has been defined as being more than a 'mere hunch,' but is 'a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'" *Id.* at 589, 861 A.2d 62 (citing *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 675–76, 145 L.Ed.2d 570 (2000); *Nathan v. State,* 370 Md. 648, 663, 805 A.2d 1086 (2002)).

The Court also cited *State v. Jenkins,* 82 Conn.App. 111, 842 A.2d 1148 (2004), where the Connecticut intermediate appellate court "had occasion to address the appropriateness of a strip search incident to a *felony* arrest." *Id.* at 591, 861 A.2d 62 (emphasis in original). In *Jenkins,* an officer performed a strip search incident to the arrest of appellant who was attempting to sell him heroin. Faced with a Fourth Amendment challenge to the strip search, the court applied the *Bell* factors and "explained that the officer had reason to believe that [the defendant] was carrying contraband because the officer was meeting [the defendant] presumably to buy heroin." *Id.* at 592, 861 A.2d 62 (citing *Jenkins,* 842 A.2d at 1157). The *Jenkins* Court also noted that "the nature of the offense for which [the defendant] was arrested created the suspicion necessary to justify the strip search. Based on those factors, the court found that reasonable suspicion existed to conduct the search of [the defendant]; therefore, the search was reasonable." *Id.* (citing *Jenkins,* 842 A.2d at 1157–58).

 *Nieves* teaches that, in institutional safety situations, reasonable, articulable suspicion that a person is carrying drugs is the threshold to be crossed before a strip search may be conducted. In considering the propriety of strip searches incident to arrest, the *Nieves* Court, referencing *Jenkins,* found a strip search made after a lawful arrest constitutional where the officer had "reasonable and articulable suspicion to believe that the arrestee [was] carrying weapons or contraband," and "the nature of the offense created the suspicion necessary to justify the strip search." *Nieves,* 383 Md. at 592, 861 A.2d 62 (citing *Jenkins* at 1157–58).

As commented before, it is well known within the police community generally and expressly acknowledged by the officers in this case, that drug traffickers secrete drugs in their body cavities to avoid detection.[11] Here, the police officers

---

11. As we shall discuss later in this Opinion, appellant also argues that he was inappropriately brought into Baltimore County by an informant

had more than reasonable, articulable suspicion that appellant, a known drug dealer, would be carrying contraband on his person or in his vehicle; they had a warrant, based on probable cause, authorizing the search of appellant and the vehicle he was driving for drugs. When a search of the vehicle from which appellant was known to distribute drugs and a search of his outer clothing did not reveal any drugs, we are persuaded that a strip search followed by a visual body cavity search was reasonable.

Other courts have reached the result that we have in this case on similar facts. *State of North Carolina v. Johnson,* 143 N.C.App. 307, 547 S.E.2d 445 (2001), is one such case. In that case, a search warrant was issued for Johnson's residence and his person based, in part, on two controlled buys and information from several anonymous informants. *Id.* at 310–11, 547 S.E.2d 445. The initial search of the premises produced several weapons, $2000.00 in small denominations, and a pair of electronic scales. *Id.* at 309, 547 S.E.2d 445. The officers then "asked [Johnson] to remove his clothing and to bend over to the waist. When he did, the officers saw a piece of plastic protruding from his anus." *Id.* They asked Johnson to remove it, and, when he did, it contained individually packaged bags of cocaine. *Id.*

Johnson contended that the evidence should be suppressed because the officer, in the search warrant application, "did not articulate specific reasons ... why a strip search was necessary and reasonable under the circumstances," and, therefore, the search "exceeded the scope of the warrant." *Id.* at 312, 547 S.E.2d 445. According to the *Johnson* Court, "the scope of a search warrant is defined by the object of the search and place in which there is probable cause to believe the object will be found." *Id.* The warrant at issue was executed "for the express purpose of procuring controlled substances likely to

---

for an "illegal purpose," presumably the sale of drugs. If that were in fact the case, the officers in this case would have had even more reason to believe that appellant was in possession of drugs when he was apprehended by the police.

be found on the premises or on the persons described in the warrant[.]" *Id.* At the suppression hearing, an officer testified "that there is a trend toward hiding controlled substances in body cavities." *Id.* at 313, 547 S.E.2d 445. Because the warrant "authorized the search of [Johnson] for illegal drugs," the court held that "it was not unreasonable under the totality of the circumstances to conduct a strip search." *Id.* In reviewing the circuit court's decision, the court recognized that some states had required "a heightened standard" to conduct strip searches, but neither the Supreme Court of the United States nor the Supreme Court of North Carolina had done so. *Id.*

In its opinion, the *Johnson* Court noted the case of *State v. Colin,* 61 Wash.App. 111, 809 P.2d 228, *disc. review denied,* 117 Wash.2d 1009, 816 P.2d 1223 (1991). *Johnson,* 143 N.C.App. at 312 n. 3, 547 S.E.2d 445. *Colin* also involved a warrant issued based on information from a confidential informant. *Colin,* 61 Wash.App. at 112, 809 P.2d 228. When the warrant was executed, Colin was subjected to a strip search and heroin was found in his underwear. *Id.* at 112, 809 P.2d 228. Colin contended that the strip search was not authorized by the search warrant which authorized officers to "search the above described ... person(s)[.]" *Id.* at 114, 809 P.2d 228. Acknowledging that a statement in the warrant application explaining "why a strip search was necessary and reasonable under the circumstances" would be useful to the court "in assessing the reasonableness of the search," the court concluded that there were "sufficient facts" in the record "to establish reasonableness." *Id.* at 115, 809 P.2d 228. The search warrant was "for the express purpose of producing controlled substances likely to be found on ... the person described in the warrant," and, the court stated, drugs "could be readily concealed on the person so that they would not be found without a strip search." *Id.* Thus, the court held that the search was reasonable. *Id.* at 116, 809 P.2d 228.

In arguing that the search warrant did not authorize the search conducted in this case, appellant cites *United States v. Nelson,* 36 F.3d 758 (8th Cir.1994). In *Nelson,* police officers

obtained a warrant to stop Nelson at an airport and search his "person" and his luggage for drugs. *Id.* at 759. Officers stopped Nelson in the airport, took him "to a police substation where his clothing and luggage were searched by the officers and a drug-sniffing dog," but no drugs were found. *Id.* The officers then placed him under arrest, removed his pants, and attempted to perform a visual inspection of his rectum. *Id.* That inspection, however, "was impossible because appellant refused to cooperate." *Id.* Officers then took Nelson to a hospital, "where a doctor attempted to perform a rectal exam while the officers restrained [him]." *Id.* Results were "inconclusive" and an X-ray was then taken of Nelson's pelvic area, "which revealed that a foreign object was in fact lodged in [his] rectum or small intestine." *Id.* An attempt was then made to administer laxatives to Nelson "through a tube from [his] mouth to his stomach, and then from his nose to his stomach." *Id.* Neither method worked but then Nelson agreed to drink the laxatives. *Id.* But, before the administration of the laxatives, Nelson had expelled the object and then swallowed it. *Id.* A second x-ray revealed that the foreign object was then lodged in his stomach. *Id.* After doctors determined that the object would not pass, Nelson agreed to an endoscopy, in which doctors successfully removed the object, which was "found to be a packet of heroin wrapped in a plastic bag." *Nelson*, 36 F.3d at 760.

The United States Court of Appeals for the Eighth Circuit concluded that "the search warrant for appellant's 'person' was not sufficient to authorize a body cavity search." *Id.* It stated that "[t]he need to provide specificity in a warrant is clearly exhibited in this case where appellant was to be subjected to a body cavity search and twice asked to see the warrant authorizing the search before submitting to this invasive procedure." *Id.*

In *Nelson*, the body cavity search that was conducted was clearly a manual body cavity search performed after prior search efforts had not revealed the presence of drugs. Moreover, it was substantially more invasive and protracted than the search and the resulting seizure conducted in this case.

Here, a corner of the plastic baggie was discovered during the visual body cavity search which provided clear evidence of drug trafficking, and which, in turn, provided the probable cause for arrest and the ultimate seizure of the drugs incident to that to arrest.

### Identity of the Confidential Informant

At the hearing on the motion to produce the identity of the informant, defense counsel asked Detective Toland "[if he] or anyone working under the aegis of the Baltimore County Police Department [made] a phone call to [appellant] to bring him to Baltimore County?" The State objected, arguing:

> The circumstances in which [the warrant] was executed or how it was executed I don't think are necessary or appropriate. I think the fact that the officers did in fact have a lawful search and seizure warrant, was within the statutory time period, and upon discovering the vehicle that was named and the Defendant, they executed that warrant.

The motion court stated that it believed that "[the informant's] reliability [was] really established in the first three paragraphs that's stated in the probable cause that was submit[ted] to [the court]." Defense counsel agreed, responding, "I am not contesting that, Your Honor." Instead, he wanted to know: "[D]id this informant [ ] bring [appellant] out for an illegal purpose? Is this the defense of entrapment? Is this the defense that the informant was playing two sides of the street?"

According to defense counsel, a "phone call was made" by the "informant to bring [appellant] out to Baltimore County[.]" Therefore, according to counsel, the State was required to disclose the circumstances surrounding appellant's arrival in Baltimore County in order to facilitate a possible entrapment defense. Defense counsel made many more attempts to gain such information from Detective Toland:

[Defense Counsel]: (To Detective Toland on cross examination) [D]id you, by way of police action, draw [appellant] to that location?

[State Attorney]: Your Honor, I'm going to object again.

The Court: Sustained.

\* \* \*

[Defense Counsel]: In January 2006, [ ] under your authority, somebody called [appellant's] cell phone, isn't that correct?

[State Attorney]: Again, Your Honor, objection.

The Court: Sustained.

[Defense Counsel]: All right. One last try, Judge. Did you, did you, Detective Toland, or anybody else from the Towson Precinct prior to the warrant being executed, did you call [appellant]?

[State Attorney]: Again, Your Honor, it's the same line of questioning. The State would object.

The Court: Sustained.

[Defense Counsel]: Well, I'll ask it this way then. Sir, I direct your attention to the 25th day of January, 2006. Under your command, did a CI 4730 call [appellant]—and let me get the question out first—and bring him to the particular place where the—where the warrant was executed?

[State Attorney]: Your Honor, again I'm going to object. I think we're—we're trying to establish any number of ways in what the police could have found this out. And if the Defendant had a conversation with—with one, two, three, four, or five people concerning his whereabouts, I think all this does is to limit the—or to identify that person. And I think that's—

The Court: Sustain the objection.

\* \* \*

[Defense Counsel]: When the warrant was executed, was CI 4730, was it on the—in or around, in or around the area where the warrant was executed?

Detective Toland: No.

[Defense Counsel]: Okay. Was the—was CI 4730, was its name Lashay (Phonetic)?

[State Attorney]: Objection, Your Honor.

The Court: Sustained.

The court concluded that it was "irrelevant at this point how [appellant] got there," and ultimately denied disclosure of the informant's identification. Appellant contends that the court erred in not permitting him "to elicit information in order to determine whether the State should be compelled to disclose the confidential informant's identity." According to appellant:

> Defense counsel attempted several times to elicit information from Detective Toland regarding the confidential informant's role in the events immediately prior to [appellant's] arrest. Specifically, Defense Counsel asked Detective Toland whether the confidential informant was merely a tipster or someone who played a role in the events immediately leading up to [appellant's] arrest[.]

Appellant argues that, "even if the potential defense of entrapment seemed 'incredibly naive' to the court, nonetheless, it was not the trial court's role to decide the credibility of a proffered defense." [12] He asserts that "[t]he court erred in failing to balance the materiality of the confidential informant's testimony to the determination of the accused's guilt or innocence against the State's interest in protecting the identity of the informer."

According to the State:

> To the extent [appellant]'s challenge extends to determining what procedures or investigative techniques the Baltimore County Police employed to find [appellant] after the warrant had been issued, [appellant]'s apparent attempt to

---

12. The reference is to *Hardiman v. State,* 50 Md.App. 98, 104–05, 436 A.2d 923 (1981), where the this Court stated that "[a]s incredibly naive (or inherently unbelievable) as appellant's story may make him appear, it is not our role on appeal, nor the trial judge's on weighing the demand, to decide the credibility of a proffered defense submitted to assess the purpose of disclosure."

link that information to the confidential informant mentioned in the warrant is purely speculative. The motions court properly held that [appellant] was not entitled to information regarding the police investigation related to [appellant]'s whereabouts on the evening when police stopped him, finding such information to be irrelevant to the issue of the identity of the warrant informant and probable cause for issuing the search warrant based on [appellant]'s earlier activities....

The State further argues:

[T]here is nothing in the record to suggest that the informant had any involvement in the police stopping [appellant] on January 25th, or that [appellant] had been engaging in any criminal activity on that date. [Appellant]'s attempt to discover the identity of the warrant informant based on an unsupported, and purely speculative allegation that the informant was involved in tipping off police about [appellant]'s whereabouts on January 25th, was properly rejected by the motions court....

In the State's view, defense counsel was appropriately prevented from inquiring into how appellant arrived in Baltimore County because it was "irrelevant" how police knew where to find appellant and that the inquiry would threaten exposure of the informant's identity.

Under Rule 4–263(g)(2):

The State's Attorney is not required to disclose the identity of a confidential informant unless the State's Attorney intends to call the informant as a State's witness or unless the failure to disclose the informant's identity would infringe a constitutional right of the defendant.

In *Edwards v. State,* 350 Md. 433, 440–41, 713 A.2d 342 (1998), the Court of Appeals stated:

The modern law governing the circumstances in which the State must disclose the identity of a confidential informant derives largely from three principles enunciated in *Roviaro v. United States,* [ ] 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 [ (1957) ]. The first principle was a reaffirmation of the

well-established common law privilege possessed by the Government "to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law[.]" *Id.* at 59, 77 S.Ct. at 627, 1 L.Ed.2d at 644. That privilege, the Court said, is designed to encourage citizens to communicate their knowledge of criminal activity to law enforcement officials by preserving their anonymity and thus has as its purpose "the furtherance and protection of the public interest in effective law enforcement." *Id.* The second principle announced in *Roviaro* was that the privilege of non-disclosure is limited by its underlying purpose and is further constrained by "fundamental requirements of fairness." Thus, the Court held, "where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60–61, 77 S.Ct. at 628, 1 L.Ed.2d at 645. Integration of those two principles produced the third—the requirement that, when presented with a defendant's demand for disclosure, courts must "balance the public interest in protecting the flow of information against the individual's right to prepare his defense." Whether the balance requires disclosure, the Court added, "must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* at 62, 77 S.Ct. at 629, 1 L.Ed.2d at 646.

The *Roviaro* balancing process focuses on " 'the materiality of the informer's testimony to the determination of the accused's guilt.' " *Edwards,* 350 Md. at 442, 713 A.2d 342 (quoting *Warrick v. State,* 326 Md. 696, 701, 607 A.2d 24 (1992)). As the Court explained:

In that regard, courts have (1) drawn a distinction between an informant who actually participated in the criminal activity with which the defendant is charged, who may, as a result, have direct knowledge of what occurred and of the defendant's criminal agency, and who therefore may be a

critical witness with respect to the defendant's guilt or innocence, on the one hand, and, on the other, an informant who is a mere "tipster"—a person who did nothing more than supply information to a law enforcement officer, who did not participate in the criminal activity and may not even have been present when it occurred, and who has little or no knowledge of the defendant's guilt or innocence, and (2) tended to require disclosure in the first situation but not in the second.

*Id.*

The *Edwards* Court, addressing the standard of review, stated: "Because the ultimate decision, assuming the application of correct principles of law in the balancing process, is a discretionary one with the trial court, we look to see whether the court applied correct legal principles and, if so, whether its ruling constituted a fair exercise of its discretion." *Id.* at 441–42, 713 A.2d 342 (citing *Gulick v. State*, 252 Md. 348, 354, 249 A.2d 702 (1969); *Brooks v. State*, 320 Md. 516, 525, 578 A.2d 783 (1990)).

This Court, in *Bowser v. State*, 50 Md.App. 363, 368–69, 439 A.2d 1 (1981), explained:

In Maryland, the "subjective" test, also known as the "origin of interest" test, governs the defense of entrapment. *See Simmons v. State*, 8 Md.App. 355, 259 A.2d 814 (1969).[13] The test was approved by the Court of Appeals in *Grohman v. State*, 258 Md. 552, 267 A.2d 193 (1970), *cert. denied*, 401 U.S. 982, 91 S.Ct. 1204, 28 L.Ed.2d 334 (1971), and reiterated by this Court in *Dravo v. State*, 46 Md.App. 622, 629–30, 420 A.2d 1012 (1980). Under the "subjective" test, the mere affording of an opportunity to commit an offense does not constitute entrapment. Entrapment occurs

---

**13.** In *Simmons v. State*, 8 Md.App. 355, 360–361, 259 A.2d 814 (1969), we explained:

We construe the opinion of the [United States Supreme] Court in *Sorrells v. United States*, 287 U.S. 435, 452 [53 S.Ct. 210, 77 L.Ed. 413] (1932) as enunciating what has been termed the "origin of interest" test. This test was stated in substance by Judge Learned Hand in *United States v. Sherman*, 200 F.2d 880 (2d Cir.1952).

when a police officer or government agent induces the commission of a crime by one who, except for the government's enticement, solicitation or persuasion, would not have committed the crime. The test requires two inquiries:

(1) [W]hether there was an inducement on the part of the government official . . . and if so

(2) [W]hether the defendant showed any predisposition to commit the offense.

Historically, some courts have held that the defendant bears the burden of establishing the inducement prong and the State bears the burden of establishing the predisposition prong of the test.[14] And, as noted, there is Maryland precedent supporting that position, but, in *Sparks v. State,* 91 Md.App. 35, 68, 603 A.2d 1258 (1992), *cert. denied,* 327 Md. 524, 610 A.2d 797 (1992), the "notion of separate and opposing burdens of persuasion" was rejected. Judge Moylan, writing for the Court, explained the allocation of burdens as follows, *id.* at 65–66, 603 A.2d 1258:

Doctrinally, the elements of the defense that an accused must establish to make a *prima facie* case are:

1. The *presence* of an inducement, and

2. The *absence* of a predisposition.

Conversely, the State's burden of persuasion to overcome such a *prima facie* case is to prove:

1. The *absence* of an inducement, and/or

---

14. *See Simmons,* 8 Md.App. at 364–365, 259 A.2d 814 ("The defense of entrapment having been raised, the issue of whether a defendant has been entrapped is for the trier of fact as part of its function of determining the guilt or innocence of the accused. Thus it is a matter of the sufficiency of the evidence. The burden as to the first question— did the police, directly or through their agent, induce the defendant to commit the offense charged in the indictment—is on the defendant. This may be established by a preponderance of the evidence. The burden as to the second question—was the defendant's criminal conduct due to his own readiness and not to the persuasion of the police, that is, did he have a predisposition to commit the offense—is on the State. This must be established beyond a reasonable doubt." (Footnotes omitted.)); *Grohman,* 258 Md. at 559, 267 A.2d 193.

2. The *presence* of a predisposition.

*Id.*

In *Simmons,* 8 Md.App. at 365 n. 7, 259 A.2d 814, we defined "predisposition" as whether "the defendant's criminal conduct [was] due to his own readiness and not to the persuasion of the police[.]" "In other words, was the defendant ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offense." [15] *Id.* at 365 n. 8, 259 A.2d 814.

We defined "inducement" in *Sparks,* 91 Md.App. at 87, 603 A.2d 1258:

An inducement, by its very nature, contemplates more than a request and an affirmative response. It embraces, as well, the indispensable notion of an effective catalytic agent. It is more than a solicitation. *Adcock v. State,* 66 Md.App. 454 [504 A.2d 1160] (1986). It is more than even a successful solicitation. It also requires something by way of the unresisted bait of the effective precipitating agent that actually seduced an otherwise virtuous person from the paths of righteousness *into the ways of the ungodly.* It involves that sort of "grave threat," "fraud," or "extraordinary promise," described by Judge Posner in *United State [States ] v. Evans,* 924 F.2d 714, 717 (7th Cir.1991), that can "blind that ordinary person to his legal duties." It requires, in a word, a catalyst.

Here, we are called upon to consider whether, by failing to allow appellant to cross-examine Detective Toland concerning the possibility that State action was involved in bringing appellant to a certain location in Baltimore County on January 25, 2006, the court impermissibly precluded appellant from establishing a defense of entrapment. We hold that it did not.

---

**15.** *See also Kamara v. State,* 184 Md.App. 59, 77, 964 A.2d 244 (2009) ("Predisposition is the 'willingness to commit a crime' and 'may be shown by evidence, direct or circumstantial, that the defendant was ready and willing to commit the crime charged prior to the time that the law enforcement officers made initial contact.' Maryland Criminal Pattern Jury Instruction ('MPJI–CR') 5:04 (2007 Suppl.).")

It is important to remember that the entrapment issue in this case arises in the context of a pretrial motions hearing to reveal the identity of an informant and involved balancing the public interest in effective law enforcement against an individual's right to prepare a defense. Whether appellant could establish entrapment as a matter of law or whether he could establish a *prima facie* case of entrapment that would entitle him to a jury instruction at trial was not at issue. Those would be matters for another day. At issue was whether appellant could show, by proffer or otherwise, that the identity of the informant was necessary to prepare his defense. In our view, when appellant's repeated requests for information regarding the informant and his or her role in bringing appellant to Baltimore County on January 25, 2006, were made, he had not sufficiently shown that the disclosure of that information was necessary to the proper preparation of a defense of entrapment. We explain.

The status of the inducer as a government agent may be an essential part of an entrapment defense, and the answer may lie with a third party. On the other hand, other essential elements of the defense are within the knowledge of the person who was induced. Appellant knew what and, presumably, who brought him to the location where the warrant was served. In fact, defense counsel represented to the motions court that, "[i]n [his] opinion, a phone call was made by the informant to bring [appellant] out [to] Baltimore County." Later defense counsel asked, "Was the—was CI 4730, was its name Lashay (Phonetic)?" This representation is as close to an entrapment proffer that appellant makes, but it falls short of establishing the inducement necessary to generate an entrapment defense [16] and it does not address appellant's lack of

---

16. *See Stewart v. State,* 232 Md. 318, 321, 193 A.2d 40 (1963) ("There was no repeated and persistent solicitation of a previously law abiding citizen in order to overcome his reluctance to commit a crime. There was only the permissible offering of an opportunity to a known offender to exercise his predisposition to violate the law."); *Sparks,* 91 Md.App. at 88, 603 A.2d 1258 (" ' "A showing of solicitation alone, however, will not suffice to place the burden of going forward with the evidence on

predisposition at all. If anything, it suggests that a phone call requesting illegal drugs was all it took to have him bring a total of 5.8 grams of drugs to the caller. The fact that appellant affirmatively responded to such a request provided little, if any, weight on the disclosure side of the scale.[17]

It was incumbent upon appellant to at least proffer those elements of an entrapment defense that were within his knowledge. Why did appellant respond to the "phone call?" What was it about that call or the caller that " 'blind[ed him] to his legal duties[?]' " *Sparks,* 91 Md.App. at 86, 603 A.2d 1258 (quoting *United States v. Evans,* 924 F.2d 714, 717 (7th Cir.1991)). Why was it an effective and irresistible bait that he could not ignore?

Appellant did not need to know if the caller was, in fact, a government agent, to make such a proffer. Moreover, the proffer could have been based upon the out-of-court assertions of the inducer that overcame his free will. As Judge Moylan wrote in *Sparks,* 91 Md.App. at 94, 603 A.2d 1258:

> The defendant's version of the siren song will, in any event, almost always be more seductive and enthralling than either 1) the real story or 2) the version to which the siren herself might testify.

That appellant did not suggest an absence of predisposition, might be easily explained. The probable cause upon which the search warrant was issued was based upon appellant's involvement in dealing drugs. In addition, appellant's record, which would have been available to the State to overcome his claim of the absence of predisposition, reflects an extended history of drug distribution offenses.

---

the government, since solicitation by itself is not the kind of conduct that would persuade an otherwise innocent person to commit a crime." ' " [*United States v. Velasquez,*] 802 F.2d 104, [106 (4th Cir.Md. 1986)] (quoting with approval *United States v. DeVore,* 423 F.2d 1069, 1071 (4th Cir.1970))).

**17.** *See Edwards,* 350 Md. at 442, 713 A.2d 342.

Had appellant proffered a *prima facie* case of inducement and the absence of predisposition, the identity and status of the caller as an informant may have had some relevance and the court may have found the informant's testimony "material" to "the determination of [appellant's] guilt." *Edwards*, 350 Md. at 442, 713 A.2d 342. But, until then, there was neither relevance nor materiality.

Therefore, we see neither error nor an abuse of discretion by the court in not disclosing the status and identity of the informant to appellant.

## Sufficiency of the Evidence

█ Appellant also contends that the evidence presented was insufficient to sustain his conviction for possession with intent to distribute cocaine and heroin. He argues that "the expert testimony by Detective Toland, that the quantity of drugs was indicative of an intent to distribute drugs, was insufficient to sustain a guilty verdict." In support of his argument, he points out that he "told Detective Toland that he was a drug addict" and that "the police did not recover from [him] any other indications of distribution, such as tally sheets, scales, cutting materials, vials, or empty gelcaps." According to appellant, "the [S]tate conceded that the police did not witness [him] engaging in a drug transaction," and that "[t]here was no testimony by any other person claiming to have engaged in a drug transaction with [him]." He states that he possessed "a relatively small amount" of drugs, which "did not render implausible" his statement that the drugs were for his personal use.

In *Turner v. State*, 192 Md.App. 45, 80–81, 993 A.2d 742 (2010), we stated:

The standard of review for the sufficiency of evidence is well settled. We must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original); *see Rivers v. State*, 393 Md.

569, 580, 903 A.2d 908 (2006); *Moye v. State,* 369 Md. 2, 12, 796 A.2d 821 (2002).

Notably, factual determinations, such as the resolution of conflicting evidence and weighing the credibility of witnesses, are always matters for the fact finder. *Longshore v. State,* 399 Md. 486, 499, 924 A.2d 1129 (2007). As this Court has said:

> "In an action tried before a jury, it is the jury's task, not the court's, to measure the weight of evidence and to judge the credibility of witnesses. In performing this role, the jury has the power to decide which testimony to accept and which to reject. In this regard, it may believe part of a particular witness's testimony, but disbelieve other parts of that witness's testimony. Moreover, it is the exclusive function of the jury to draw reasonable inferences from proven facts."

*Smith v. State,* 176 Md.App. 64, 69, 932 A.2d 773 (2007) (citation omitted).

The jury heard Detective Toland testify as an expert concerning normal practices related to distribution of drugs. In *In re Timothy F.,* 343 Md. 371, 382, 681 A.2d 501 (1996), the Court of Appeals stated that, "[o]rdinarily, the way a [controlled dangerous substance] is packaged and its quantity are circumstances from which it may be inferred that a person in possession of that CDS intends to distribute it." Here, evidence was presented by the State that eleven baggies of crack cocaine and ten baggies of heroin were found in appellant's body cavity. In addition, Detective Toland observed no marks or other indications of drug use on appellant's body that might support appellant's claim that he was an addict and the drugs were for his personal use. The jury could reasonably infer from this evidence that physical possession of this amount of illegal drugs packaged in separate baggies was with the intent to distribute the drugs and found the essential elements of the crimes for which appellant was convicted beyond a reasonable doubt.

740

JUDGMENT OF THE CIRCUIT COURT FOR BALTI-
MORE COUNTY AFFIRMED. COSTS TO BE PAID BY
APPELLANT.